[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-10735
_____

D.C. Docket No. 1:13-cr-00081-KD-N-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOSEPH ADAM MCILWAIN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(November 25, 2014)

Before HULL, MARCUS, and DUBINA, Circuit Judges.

HULL, Circuit Judge:

On November 7, 2012, and after an evidentiary hearing, the Probate Court of Choctaw County, Alabama, ordered Joseph Adam McIlwain committed to the custody of the Alabama State Department of Mental Health.  On April 25, 2013, a federal grand jury indicted McIlwain for possession of a firearm by a prohibited person under 18 U.S.C. § 922(g).  Section 922(g)(4) criminalizes the possession of a firearm by any person "who has been committed to a mental institution." 18 U.S.C. § 922(g)(4).

This appeal concerns what constitutes a commitment to a mental institution under § 922(g)(4) and whether McIlwain's prior commitment by an Alabama probate court satisfies that element.  After review and with the benefit of oral argument, we conclude McIlwain's prior commitment fell within § 922(g)(4) and affirm the district court's denial of McIlwain's motion to dismiss the indictment.

## I. BACKGROUND

### A.    The November 2012 Commitment

On November 1, 2012, Chief Paul Johnson of the Pennington, Alabama Police Department arrested McIlwain on an outstanding felony warrant for possession of marijuana.  In attempting to make the arrest, Johnson was initially unable to get McIlwain to stop his vehicle.  According to Johnson, each time he approached the vehicle, McIlwain would state that he knew Johnson was there to shoot or kill McIlwain.

2

McIlwain stopped his vehicle at his parents' home.  There, McIlwain continued to express fear that Johnson intended to harm him.  Johnson reported that McIlwain shouted, "Just go ahead and shoot me.  I know what you're here for.  Just kill me."  When Johnson and another officer, who had arrived at the scene, noticed McIlwain had a knife on his lap, McIlwain reportedly stated: "It shouldn't be a knife that you're worried about.  It should be guns.  Y'all are here to kill me.  I'm going to kill y'all."

Eventually, McIlwain's mother entered the vehicle and a brief struggle ensued over a firearm in McIlwain's possession.  Johnson used his taser on McIlwain, who was then taken into custody.  McIlwain was taken by ambulance to a hospital, but refused medication prescribed to him, protesting the quantity of the medication and again stating the fear that others were attempting to harm or kill him.  On November 1, McIlwain was then taken to the Choctaw County Jail.  The record reveals no charges filed against McIlwain related to this incident, other than the already outstanding marijuana possession charge.

On November 6, 2012, Choctaw County Sheriff Tom Abate filed a petition with the Probate Court of Choctaw County seeking commitment of McIlwain to the custody of the Alabama Department of Mental Health.[1]  The petition stated that

---

[1]The Sheriff's petition is dated November 6, 2012, but the probate court order indicates that it may have been filed on November 7, 2012, the day of McIlwain's commitment hearing.

3

Choctaw County was McIlwain's home county and that, at the time the petition was filed, McIlwain was being held at the Choctaw County Jail.

As grounds for commitment, the petition alleged: (1) that "McIlwain [was] mentally ill with a diagnosis of Altered Mental Status, Bi-Polar Disorder with extreme Paranoia tendencies, [and] Manic Depression"; (2) that McIlwain posed a "real and present threat of substantial harm" to himself and others; (3) that McIlwain, if not treated, would "continue to suffer mental distress and . . . experience mental deterioration of his ability to function independently"; (4) that McIlwain was "unable to make a rational or informed decision as to whether or not treatment was desirable or needed"; and (5) that the danger McIlwain posed to others was evidenced by the fact that he was not "eating or sleeping properly," had "exhibited episodes of violent and irrational behavior," and had "a history of increased confusion, [ ] agitation, [and] verbal and physical threats to his parents and others . . . ."

As to the relief sought by the petition, involuntary commitment, the Sheriff alleged: (1) that treatment was available for McIlwain's illness; (2) that "confinement [was] necessary for his and the community's safety and well-being"; and (3) that commitment was "the least restrictive alternative necessary and available for treatment of his illness."

4

The order of commitment details the events of November 7, 2012. The probate court appointed an attorney, James Abston, to represent McIlwain and serve as guardian ad litem during the proceedings. Abston received notice of the hearing scheduled for that day. "[D]eclar[ing] that an emergency existed," Abston waived the preliminary hearing along with McIlwain's presence in court and "advised the Court that he was ready to proceed with the Final Hearing."

At that final hearing, the probate court heard testimony from three parties before hearing from McIlwain himself. First, the court heard from Sheriff Tom Abate, who testified as to his own observation of McIlwain's symptoms of mental illness during his confinement in the Choctaw County Jail. Abate testified that the jail administrator contacted him after McIlwain made an attempt at suicide in his jail cell. Abate testified that McIlwain was placed on suicide watch and, after McIlwain's attempts at self-harm continued, he was placed in restraints so he could not harm himself. Abate stated that McIlwain was a threat to himself and to others, and that his behavior in the Choctaw County Jail caused Abate to file the petition for involuntary civil commitment.

Second, the court heard testimony from Chief Paul Johnson regarding the events of November 1, 2012. Johnson testified to McIlwain's disturbed mental state at the time of his arrest, as well as the danger to himself and others created by McIlwain's agitation and disturbance and his possession of firearms at the time. In

5

addition, Johnson testified that McIlwain's mother reported that she had "fought [McIlwain] over a gun four or five times in the past two weeks."

Third, the court heard testimony from Deborah Wilson, an employee of West Alabama Mental Health acting as liaison to the state probate court. Wilson testified to serving as the court liaison for two years and to twelve years of experience, as well as an unspecified educational background, in mental health care and treatment. Wilson was offered as an expert without objection. Wilson testified that she evaluated McIlwain earlier in the day, in advance of the hearing. She testified to knowledge that McIlwain had been diagnosed as suffering from mental illness. In addition, she testified that treatment was available, that commitment was the least restrictive alternative, and that her recommendation was that McIlwain be committed for treatment. On cross-examination, Wilson was asked if McIlwain would receive treatment on his own. Wilson indicated McIlwain would not, citing the testimony of the other witnesses as well as McIlwain's previous failure to seek treatment and at least one instance where he scheduled an appointment at West Alabama Mental Health but had not followed through on that appointment.

Finally, the court heard testimony from McIlwain, who had been present in the hearing for the testimony of all previous witnesses. McIlwain contested certain factual characterizations of the witnesses, but concurred with Johnson's testimony

that McIlwain feared that the police (and later, the doctors at the hospital) meant to do him harm. McIlwain stated that, at the time of the hearing, he continued to hold those beliefs. On cross-examination, McIlwain conceded that he had been diagnosed as mentally ill and that he was in need of medication. He explained that he had been unable to afford medication for some time. McIlwain was asked whether he "was asking this court to help him," and responded affirmatively.

The state probate court granted Sheriff Abate's petition seeking McIlwain's involuntary commitment. In its order issued November 7, 2012, the state probate court made three explicit findings. The court found: (1) that McIlwain was mentally ill and posed a real and present threat of substantial harm to himself and others; (2) that treatment was available for the illness diagnosed, and confinement was necessary for McIlwain and the community's safety and well-being; and (3) that commitment was the best and least restrictive alternative necessary and available for treatment of McIlwain's illness. The court ordered: (1) that McIlwain be committed to the custody of the Alabama State Department of Mental Health; and (2) that he be transported from Choctaw County Jail to Bryce Hospital in Tuscaloosa, Alabama for commitment.

McIlwain was transferred from the Choctaw County Jail to Bryce Hospital on November 13, 2012. There he was diagnosed with, and received treatment and medication for, Anxiety Disorder, Mood Disorder, and ADHD. On November 21,

2012, McIlwain was discharged from the facility, with referral to the West Alabama Mental Health for further treatment. The record indicates that he was discharged to jail, but does not establish any subsequent period of confinement or whether any charges were ever filed in relation to the November 1, 2012 incident. McIlwain's initial appearance on the marijuana possession charge did not occur until April 3, 2013.

**B.    The April 2013 Incident and Subsequent Indictment**

On April 1, 2013, officers of the Pennington, Alabama Police Department and the Choctaw County, Alabama Sheriff's Office received calls from McIlwain's family that McIlwain, in a state of disturbance, had recently made specific threats against individuals, was in possession of a firearm, and was driving his father's truck without authorization. Upon locating McIlwain, law enforcement attempted to conduct a traffic stop, but McIlwain initially evaded the officers, who pursued him to his parents' home in what one of the officers described as a "high-speed chase."

Upon arriving at his parents' home, McIlwain fled into a wooded area and fired three shots (none in the officers' direction). While law enforcement established a perimeter, McIlwain contacted his mother and arranged for her to pick him up. McIlwain's mother and two of his aunts retrieved him in a different vehicle, at which time he relinquished possession of the firearm, which was loaded

8

at the time with three rounds of ammunition.  The police then stopped the vehicle.  McIlwain's aunt, Wanda Tindle, turned over the firearm to police, explaining that it belonged to McIlwain.  McIlwain was arrested and charged with violating Alabama laws regarding terroristic threats and motor vehicle theft.

On April 4, 2013, a Special Agent of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) and a Choctaw County Sheriff's deputy interviewed McIlwain.  In the interview, McIlwain admitted to the purchase and possession of the firearm and to the events described above, including his prior commitment to a state mental health care facility.

On April 25, 2013, a federal grand jury indicted McIlwain for violating 18 U.S.C. § 922(g)(4), "knowing recei[pt] and possess[ion], in and affecting commerce, [of] a firearm . . . after being committed involuntarily to a mental health facility."  The indictment charges that the relevant involuntary commitment occurred "through the Choctaw County Probate Court on November 7, 2012, in Probate Court Case number M-12-4557."

## C.    The District Court Proceedings

On October 2, 2013, McIlwain moved to dismiss the indictment.  McIlwain argued that the underlying probate court commitment proceedings did not comply with due process and, as a result, the order of commitment could not serve as the basis for a prosecution under § 922(g)(4).  McIlwain contended that the proceeding

9

was in fact an emergency hearing for temporary placement in a mental health facility under Ala. Code § 22-52-7 and not a final order of commitment under Ala. Code § 22-52-10.1.

After laying out the due process requirement for involuntary civil commitment, McIlwain argued that treating his Alabama commitment order as a final order of commitment, one that would trigger criminal liability under § 922(g)(4), denied him "fundamental protections required by the Due Process Clause and set out in the commitment statutes." Specifically, he alleged two deficiencies in the process of his commitment. First, the commitment proceeding, from filing of the petition to final order, occurred in one day. Second, the probate court heard no evidence from a qualified medical professional that McIlwain had been diagnosed as suffering from a mental illness.

On October 15, 2013, the government responded to the motion to dismiss the indictment. The government argued that McIlwain's prior commitment was conducted in compliance with the relevant Alabama Code provisions and that McIlwain was not denied due process. In support of its response, the government filed these exhibits related to the commitment proceeding: (1) the probate court case detail; (2) the commitment petition; (3) the order of commitment; and (4) an audio recording of the commitment hearing.

10

On October 17, 2013, the district court entered an endorsed order denying McIlwain's motion to dismiss "for the reasons stated in the Government's [ ] response."

The parties then entered a conditional plea agreement, in which McIlwain reserved his right to timely file a direct appeal challenging, inter alia, the denial of McIlwain's motion to dismiss the indictment.  McIlwain pleaded guilty and the district court sentenced him to 24 months' imprisonment and 3 years' supervised release.[2]

## II. STANDARD OF REVIEW

We generally review the district court's denial of a motion to dismiss an indictment for abuse of discretion.  United States v. McPhee, 336 F.3d 1269, 1271 (11th Cir. 2003).  The interpretation of what constitutes commitment to a mental institution under § 922(g)(4) is a question of law that we review de novo.  See United States v. Segarra, 582 F.3d 1269, 1271 (11th Cir. 2009) ("We review questions of statutory interpretation de novo.").  And whether an indictment sufficiently alleges a statutorily proscribed offense is a question of law that this Court reviews de novo.  United States v. Steele, 178 F.3d 1230, 1233 (11th Cir. 1999).

_____

[2]In the Judgment and Commitment order, the district court recommended to the Bureau of Prisons that McIlwain "be allowed to participate in residential, comprehensive, substance abuse treatment and intensive mental health treatment, both while incarcerated."  McIlwain also received credit for time already served.

11

## III. DISCUSSION

We first examine the elements of a § 922(g)(4) offense and then the involuntary commitment process of Ala. Code. § 22-52-1 et seq.

### A.    Section 922(g)(4)

The Gun Control Act of 1968 established classes of persons "comprehensively barred . . . from acquiring firearms by any means." Barrett v. United States, 423 U.S. 212, 218, 96 S. Ct. 498, 502 (1976). "[I]n enacting section 922(g), Congress sought [ ] to bar the possession of firearms by certain types of persons that it considered dangerous." United States v. Winchester, 916 F.2d 601, 605 (11th Cir. 1990).

Under § 922(g)(4), it is unlawful for any person "who has been adjudicated as a mental defective or who has been committed to a mental institution" to "possess[,] in or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(4) (punctuation altered and emphasis added). Other subsections of §922(g) address other categories of prohibited persons. See, e.g., id. § 922(g)(1) (convicted felons), § 922(g)(8) (persons subject to a court protective order), § 922(g)(9) (persons convicted of a misdemeanor crime of domestic violence).

Section 922(g)(4) itself does not define "committed to a mental institution." Nor has this Court determined the meaning or scope of that phrase. We thus construe § 922(g)(4) for the first time here. Whether an individual "has been

12

committed to a mental institution" under § 922(g)(4) is a question of federal law. See United States v. Giardina, 861 F.2d 1334, 1335 (5th Cir. 1988). In statutory interpretation, we accord words in the statute their ordinary or common meaning. To "commit" means "to place officially in confinement or custody." American Heritage College Dictionary 280 (3d ed. 1997).

We are also aided in our task here by the regulations of the ATF appearing in 27 C.F.R. § 478.11, entitled "Meaning of terms," which define numerous terms in § 922(g) for federal law enforcement. The regulations define, among other terms, "Committed to a mental institution" and state that the phrase means that there was a "formal commitment" by a "court, board, commission, or other lawful authority" and that the commitment was "involuntary":

> Committed to a mental institution. A formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority. The term includes a commitment to a mental institution involuntarily. The term includes commitment for mental defectiveness or mental illness. It also includes commitments for other reasons, such as for drug use. The term does not include a person in a mental institution for observation or a voluntary admission to a mental institution.

27 C.F.R. § 478.11.

Notably, the regulations emphasize that the phrase "committed" by a "lawful authority" does not include a "voluntary admission" or "a person in a mental institution for observation." This is consistent with the plain language of the statute, which states "a person who has been committed to a mental institution."

13

18 U.S.C. § 922(g)(4). The person is not voluntarily entering, but has been committed by a third party, and the commitment is not merely for observation. While this Court is not bound or required to defer to the ATF's regulations or the government's reading of a criminal statute, we find these regulations helpful and persuasive.

## B.　　Other Circuits' Decisions

Although we have not, other circuits have examined the meaning of the statutory phrase "commited to a mental institution" under § 922(g)(4). Those decisions are instructive, too.

In Giardina, the Fifth Circuit vacated a § 922(g)(4) conviction, holding that the individual had not been "committed" under the meaning of the statute. 861 F.2d at 1336-37. That defendant had previously been "detained" for two weeks of mental health treatment under the signed order of a physician and deputy coroner, each of whom executed an "Emergency Certificate" as required by Louisiana law. Id. at 1334. The Fifth Circuit held that "[a]n essential element" of § 922(g)(4) was a "formal commitment," which in Louisiana required formal action by the state district court. Id. at 1337.

Similarly, in United States v. Hansel, 474 F.2d 1120, 1125 (8th Cir. 1973), the Eighth Circuit reversed a conviction under § 922(h) (the predecessor to

14

§ 922(g)) where the defendant had been hospitalized pursuant to a county mental health board order. Though the order resulted in temporary hospitalization, the Eighth Circuit held that it was not a "commitment" under the § 922(h) statute because it did not comply with the two-step formal commitment process under Nebraska law. Id. at 1122-23. The government conceded this argument on appeal, and the Eighth Circuit termed the concession "well taken," writing: "There is nothing in [§ 922(g)(4)] which indicates an intent to prohibit the possession of firearms by persons who had been hospitalized for observation and examination, where they were found not to be mentally ill. The statute makes it clear that a commitment is required." Id. (emphasis added).

Likewise, in United States v. Rehlander, 666 F.3d 45, 46, 51 (1st Cir. 2012), the First Circuit reversed the judgments of conviction of two defendants convicted under § 922(g)(4). The defendants had been involuntarily admitted to psychiatric hospitals under Maine's "emergency procedure," which permitted only a three-day involuntary hospitalization and was conducted as an ex parte proceeding where the judge was not required to make any substantive findings. Id. at 46, 48. In contrast, Maine had a separate commitment procedure that required a traditional adversary proceeding culminating in a judicial determination. Id. at 46. The First Circuit held that Maine's emergency procedure for temporary involuntary hospitalization did not satisfy "commitment to a mental institution" under § 922(g)(4). Id. at 50.

15

The First Circuit contrasted Maine's emergency procedure with its commitment procedure:

> By contrast, involuntary commitment under [the Maine commitment procedure] is allowed only after a court holds an adversary hearing—providing counsel for the patient and an opportunity to testify and to call and cross-examine witnesses. The committing court must then itself determine whether there is clear and convincing evidence that the patient is mentally ill and poses a likelihood of serious harm, and whether better alternative arrangements exist.

Id. at 48 (citation omitted). That First Circuit determined that, under § 922(g)(4), "Congress did not prohibit gun possession by those who were or are mentally ill" and pointed out that "such a free floating prohibition would be very hard to administer." Id. at 50. Instead, "as with the ban on prior felons [under § 922(g)(1)], Congress sought to piggyback on determinations made in prior judicial proceedings to establish status." Id.

The Fourth Circuit, in United States v. Midgett, 198 F.3d 143, 146 (4th Cir. 1999), found a judicial proceeding to satisfy the "commit[ment] to a mental institution" element of § 922(g)(4). The Fourth Circuit held that the prior judicial proceeding was sufficient even where not termed a formal commitment. See id. at 145-46. All of the following facts led the Fourth Circuit to conclude that the defendant's prior confinement "f[ell] squarely" within the statutory meaning of § 922(g)(4):

> (1) [the defendant] was examined by a competent mental health practitioner; (2) he was represented by counsel; (3) factual findings

16

were made by a judge who heard evidence; (4) a conclusion was reached by the judge that [the defendant] suffered from a mental illness to such a degree that he was in need of inpatient hospital care; (5) a judicial order was issued committing [the defendant] to a mental institution; and (6) he was actually confined there.

Id. at 146.  The substance of the proceedings rendering involuntary confinement clearly indicated that a formal commitment had occurred.

A more recent Eighth Circuit decision, holding that a prior state commitment satisfied § 922(g)(4), is also helpful.  In United States v. Dorsch, 363 F.3d 784, 785 (8th Cir. 2004), the defendant entered a conditional guilty plea to a § 922(g)(4) offense.  Like McIlwain, the defendant appealed the denial of his motion to dismiss the indictment, arguing he had never been committed to a mental institution and thus was not covered by § 922(g)(4).  Id.  But the Eighth Circuit held that the defendant had been committed to a mental institution as contemplated by § 922(g)(4) and 27 C.F.R. § 478.11.  Id. at 786-87.  The Eighth Circuit focused on the formal process the defendant received under South Dakota law, stating:

> [T]he South Dakota county board found that [the defendant] was mentally ill and that involuntary commitment to a mental facility was the least restrictive treatment available for him.  This determination followed a hearing, during which [the defendant] was represented by counsel, was given the opportunity to present evidence and cross-examine witnesses, and during which a physician testified that [the defendant] was mentally ill and met the requirements of the statute.

Id. at 786.

17

All of these circuit court decisions place primary importance on whether some authoritative body—a court, a county board—rendered a decision about the defendant's mental illness and ordered commitment.

## C.    Our Analysis

McIlwain's commitment under Alabama law fell well within this general understanding.  Although we construe § 922(g)(4) under federal law, we still must examine whether the nature of McIlwain's prior commitment fits within the statutory proscription of § 922(g)(4).  See United States v. Whiton, 48 F.3d 356, 358 (8th Cir. 1995).  To do that here, we look to Alabama law.

## D.    Involuntary Commitment Under Alabama Law

Alabama law sets forth procedural and substantive requirements for the commitment of mentally ill persons.[3]  The Alabama requirements for involuntary commitment include, inter alia: (1) the filing of a petition in the probate court of the county in which the respondent is located, Ala. Code § 22-52-1.2; (2) service of

---

[3]In 1974, a three-judge district court sitting in the Middle District of Alabama invalidated Alabama's then-longstanding involuntary civil commitment statutes as violating the due process rights of those subject to involuntary commitment.  Lynch v. Baxley, 386 F. Supp. 378, 387 (M.D. Ala. 1974) (Lynch I); see Specht v. Patterson, 386 U.S. 605, 608, 87 S. Ct. 1209, 1211 (1967) ("commitment proceedings whether denominated civil or criminal are subject . . . to the Due Process Clause").  Lynch I further outlined how Alabama could structure its involuntary civil commitment statutes to satisfy its constitutional obligations.  See 386 F. Supp. at 387-90 (outlining such requirements).  The modern Alabama civil commitment statutes, Ala. Code § 22-52-1 et seq., were crafted in direct response to Lynch I.  See Lynch v. Baxley, 651 F.2d 387, 387 (5th Cir. 1981) (Lynch II); see also Lynch v. Baxley, 744 F.2d 1452, 1454 (11th Cir. 1984) (Lynch III); Lynch v. Sessions, 942 F. Supp. 1419, 1427 (M.D. Ala. 1996) (Lynch IV) (lifting injunction imposed in Lynch I and stating that its constitutional purpose "has now been accomplished" by enactment of the revised statutes).

the petition on the respondent, id. § 22-52-3; (3) appointment of an attorney and a guardian ad litem for the respondent, id. § 22-52-4; (4) a formal hearing, id. § 22-52-9; and (5) findings, based on clear and convincing evidence, by a judge that the criteria for involuntary commitment has been met, id. § 22-52-10.1.

Separately, Alabama has created ex parte procedures for the temporary hospitalization of a person pending a final commitment determination. Id. § 22-52-7(c). And the statute contains an appeal provision, allowing the respondent five days to file a notice of appeal and requiring the probate judge to issue a separate order concerning the liberty of the respondent while the appeal is pending. Id. § 22-52-15.[4]

E.    **Application of the Alabama Law to McIlwain's Commitment**

McIlwain advances several reasons why his prior commitment was not a formal involuntary commitment under Alabama law and thus does not trigger § 922(g)(4)'s prohibition. First, he argues that the entire proceeding occurred in a single day, did not provide adequate notice, and was only an emergency hospitalization. Ala. Code § 22-52-3 does require adequate notice to the respondent that a hearing will occur. But here, McIlwain's appointed counsel and

---

[4]In addition, the current version of Ala. Code § 22-52-10.8(b) includes a federally certified program for relief from firearm disability. McIlwain notes that this program was not adopted until May 21, 2013 and thus could not have benefited McIlwain with regard to his April 2013 indictment under § 922(g)(4). We mention it, however, to illustrate the current availability of relief from future criminal sanction under § 922(g)(4) for persons "committed to a mental institution" under Alabama law.

19

guardian ad litem explicitly waived the opportunity to delay the final commitment hearing.[5]  Neither the decision of McIlwain's counsel to waive the preliminary hearings nor the state probate court's acceptance of that waiver deprived McIlwain of the Alabama's statutory process afforded him under its involuntary commitment statutes.  McIlwain received a formal hearing, was represented by an attorney, and the state probate court heard sworn testimony and made substantive findings of fact that it included in its formal order of commitment.

For example, based on sworn testimony, the order of commitment made three explicit findings: (1) that McIlwain was mentally ill and posed a real and present threat of substantial harm to himself and others; (2) that treatment was available for his illness, and confinement was necessary for both McIlwain and the community's safety; and (3) that commitment was the best and least restrictive alternative necessary and available for treatment of McIlwain's illness.  And these findings tracked the criteria in the involuntary commitment statute.  See id. § 22-52-10.1.[6]

---

[5]McIlwain does not raise an ineffective assistance of counsel claim. We deem any such claim abandoned.  See United States v. Cunningham, 161 F.3d 1343, 1344 (11th Cir. 1998).

[6]All of the testimony on which these findings were based was subject to cross-examination by McIlwain's appointed counsel and guardian ad litem.  In sworn testimony, McIlwain himself acknowledged his potential danger to himself and his need for the court to assist him in receiving treatment.  The events of McIlwain's November 1, 2012 arrest demonstrate his clear danger to himself and others at times of emotional disturbance.

As the district court judge noted at sentencing on the § 922(g)(4) charge, McIlwain's April 1, 2013 arrest involved the "almost identical behavior of running off with a truck, leading police on a chase, and having a gun."

In sum, McIlwain was afforded the formal process required by Ala. Code § 22-52-1 et seq.  His commitment was a formal commitment under Ala. Code § 22-52-10.1 and not an emergency hospitalization under Ala. Code § 22-52-7.  We see no other way to construe the final order of commitment, the findings reached by the probate court, the testimony offered by sworn witnesses subject to cross-examination (including McIlwain himself), and the waiver of prior hearings by McIlwain's appointed counsel and guardian ad litem.

**F.    Collateral Attack**

Even if McIlwain could show some infirmity in his commitment hearing, we still hold that he was "committed to a mental institution" under the meaning of § 922(g)(4).  Though we have not previously reached this issue with regard to § 922(g)(4), we are strongly guided by our precedents concerning § 922(g)(1) and § 922(g)(8), which do not allow collateral attacks on underlying state court convictions or protective orders to challenge indictments under § 922(g).

In Lewis v. United States, 445 U.S. 55, 65, 100 S. Ct. 915, 921 (1980), the Supreme Court held that "§ 1202(a)(1) [the predecessor to § 922(g)(1)] prohibits a felon from possessing a firearm despite the fact that the predicate felony may be subject to collateral attack on constitutional grounds."  We have faithfully applied this controlling precedent.  See United States v. Standridge, 810 F.2d 1034, 1038 (11th Cir. 1987) ("In light of Lewis . . ., it is unnecesary [sic] that the [ ] predicate

21

convictions be truly valid in order to satisfy section 1202(a).").  And we have expanded its application beyond § 922(g)(1) (prior felony conviction) to § 922(g)(8) (person subject to court protective order).  See United States v. DuBose, 598 F.3d 726, 733 (11th Cir. 2010) ("We . . . hold that protective orders satisfying the Section 922(g)(8) requirements are analogous to felony convictions for the purposes of the statute's restraint on the possession of firearms.  Reasoning from Lewis, the validity of an underlying protective order is therefore irrelevant to a defendant's conviction under Section 922(g)(8)."). We see no reason that § 922(g)(4) should be subject to a validity requirement that other subsections of § 922(g) are not.

Nor do we accept McIlwain's argument that the Supreme Court's decision in District of Columbia v. Heller, 554 U.S. 570, 128 S. Ct. 2783 (2008), altered this landscape.  Not only is the right recognized in Heller a qualified right—not intended to "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," id. at 626-27, 128 S. Ct. at 2816-17—but McIlwain does not contend that it was his § 922(g)(4) indictment that lacked due process. Rather, he argues that his state commitment proceeding was constitutionally deficient.  But long before Heller, the Lynch I decision had held that the Alabama involuntary commitment system was subject to due process requirements.  See Lynch I, 386 F. Supp. at 387.  Nothing in the Supreme Court's decision in Heller

22

entitles McIlwain to a collateral attack in federal court on a commitment he did not—and has not in any way—challenged in the state court.

## CONCLUSION

For the foregoing reasons, we hold the district court did not abuse its discretion in denying McIlwain's motion to dismiss the indictment. McIlwain's conviction is

**AFFIRMED.**