In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
No. 22-2208
STEFEN ESCAMILLA,
 Plaintiff-Appellant,
 v.

UNITED STATES OF AMERICA,
 Defendant-Appellee.
 ____________________

 Appeal from the United States District Court for the
 Eastern District of Wisconsin.
 No. 1:21-cv-00510 — William C. Griesbach, Judge.
 ____________________

 ARGUED JANUARY 19, 2023 — DECIDED MARCH 9, 2023
 ____________________

 Before BRENNAN, SCUDDER, and KIRSCH, Circuit Judges.
 KIRSCH, Circuit Judge. Stefen Escamilla attempted to pur-
chase a handgun but was denied because he had previously
been committed to a mental institution. See 18 U.S.C.
§ 922(g)(4). Escamilla sued the federal government, arguing
that he does not satisfy either of the statute’s conditions and
seeking an order directing the government to approve the
ﬁrearm transfer. On cross motions for summary judgment,
the district court determined that Escamilla’s prior
2 No. 22-2208

hospitalization in a mental health unit qualiﬁed as having
been committed to a mental institution, and therefore, he was
prohibited from possessing ﬁrearms under § 922(g)(4). Esca-
milla appeals, arguing that his eleven-day hospitalization did
not qualify as a commitment because he was there on a vol-
untary and informal basis. But the district court properly con-
cluded that Escamilla’s hospitalization qualiﬁed as a “com-
mit[ment] to a mental institution” under New York state law
for the purposes of § 922(g)(4), warranting summary judg-
ment for the government. Escamilla also contends that the
district court abused its discretion in taxing costs against him.
We aﬃrm the judgment but modify the costs award to correct
a calculation error.
 I
 In 2018, Stefen Escamilla was hospitalized while serving
in the Army and stationed at Fort Drum in New York. That
March, Escamilla attended an on-base medical appointment
and complained of hearing voices all the time that were tell-
ing him to commit suicide and would get mad at him when
he didn’t listen. He was referred to an on-base psychologist
who suggested he seek treatment at Samaritan Hospital. Es-
camilla agreed to go and was escorted by Fort Drum person-
nel.
 At Samaritan, he was examined by a doctor and admitted
to the inpatient mental health unit under New York State
Mental Hygiene Law (NYMHL) § 9.39(a), which permits the
director of a hospital to “receive and retain therein as a patient
for a period of fifteen days any person alleged to have a men-
tal illness for which immediate observation, care, and treat-
ment in a hospital is appropriate and which is likely to result
in serious harm to himself or others.” Doctor’s notes from his
No. 22-2208 3

initial examination indicate that Escamilla was experiencing
auditory hallucinations, depression, and suicidal thoughts
with a plan to carry them out. A second doctor examined him
the next day and confirmed the first doctor’s findings.
 Escamilla was discharged from the hospital eleven days
later. His discharge notes include diagnoses of mild depres-
sive disorder, social anxiety disorder, panic disorder, and au-
tism spectrum disorder. They also indicate that Escamilla did
not want to be discharged because he did not feel safe at Fort
Drum.
 Just over a year after his hospitalization, in July 2019, Es-
camilla attempted to purchase a handgun from an online re-
tailer who shipped the gun to a federal firearm licensee in Ap-
pleton, Wisconsin. The licensee performed a background
check on Escamilla using the National Instant Criminal Back-
ground Check System. The background check generated an
automatic response denying the firearm transfer. Escamilla
inquired about the reasons for the firearm transfer denial, and
the FBI informed him that he was prohibited from possessing
a firearm pursuant to 18 U.S.C. § 922(g)(4), as a person who
“has been adjudicated as a mental defective or who has been
committed to a mental institution.”
 Escamilla filed this suit under 18 U.S.C. § 925, which al-
lows a person who has been denied transfer of a firearm un-
der § 922(g) to bring an action against the United States for an
order directing that the transfer be approved. The govern-
ment filed a notice of appearance but failed to respond to Es-
camilla’s complaint, so the clerk entered a default, and Esca-
milla moved for a default judgment. During a hearing on the
motion for default judgment, the government admitted that
its failure to respond to Escamilla’s complaint was due to
4 No. 22-2208

negligence. The government moved to vacate the entry of de-
fault. The court denied Escamilla’s motion, vacated the entry
of default, and granted the government leave to file an an-
swer.
 Litigation continued, culminating in both parties moving
for summary judgment. The court ruled for the government,
concluding that Escamilla’s admittance to Samaritan under
NYMHL § 9.39 constituted a “commitment” within the mean-
ing of § 922(g)(4).
 II
 Escamilla first argues that the district court erred in setting
aside the government’s default. We review a grant of a motion
to vacate a default for abuse of discretion and will reverse
“only if we conclude that no reasonable person could agree
with [the court’s] judgment.” Pretzel & Stouffer, Chartered v.
Imperial Adjusters, Inc., 28 F.3d 42, 45 (7th Cir. 1994) (quotation
omitted).
 The parties do not dispute that default was properly en-
tered. The government failed to answer Escamilla’s complaint
within 60 days, see Fed. R. Civ. P. 12(a)(2), but the district
court was permitted to set aside the entry of default “for good
cause.” Fed. R. Civ. Proc. 55(c). This is a more “lenient stand-
ard” than the one for default judgments under Rule 60(b). Par-
ker v. Scheck Mech. Corp., 772 F.3d 502, 505 (7th Cir. 2014)
(quoting Cracco v. Vitran Express, Inc., 559 F.3d 625, 631 (7th
Cir. 2009)). To set aside the entry of default, the government
was required to show (1) good cause; (2) quick action to cor-
rect it; and (3) “an arguably meritorious defense to the law-
suit.” Id. (citing Sun v. Bd. of Trs. of the Univ. of Ill., 473 F.3d
No. 22-2208 5

799, 809–10 (7th Cir. 2007)). The government made the re-
quired showings here.
 First, there was good cause to proceed to the merits. Im-
portantly, “Rule 55(c) requires ‘good cause’ for the judicial ac-
tion, not ‘good cause’ for the defendant’s error[.]” Sims v. EGA
Prods. Inc., 475 F.3d 865, 868 (7th Cir. 2007); see also JMB Mfg.
v. Child Craft, LLC, 799 F.3d 780, 792 (7th Cir. 2015) (“As we
explained in Sims, an entry of default may be set aside for
‘good cause,’ which does not necessarily require a good ex-
cuse for the defendant’s lapse.”). We view default judgments
to be a “weapon of last resort, appropriate only when a party
willfully disregards pending litigation.” Sun, 473 F.3d at 811.
And the preference against default judgments is only height-
ened when such judgment is against the United States. See,
e.g., Harvey v. United States, 685 F.3d 939, 946 (10th Cir. 2012);
Stewart v. Astrue, 552 F.3d 26, 28 (1st Cir. 2009). The stakes are
high when, as here, public safety is at risk. As such, there was
a strong interest in deciding the case on the merits. See Sun,
473 F.3d at 811 (“This Circuit has a well established policy fa-
voring a trial on the merits over a default judgment.”).
 Second, the government took prompt steps to correct its
default. What constitutes quick action varies from case to
case. In Sims, for example, we found that vacating an entry of
default was proper even though the government did not
move to vacate until five months after the deadline for its an-
swer had passed. 475 F.3d at 866, 868. Here, the government
filed its answer five weeks after the original deadline, and the
district court did not abuse its discretion in deciding that the
government had satisfied the prompt-action requirement.
 Third, as we discuss further below, the government pre-
sented a meritorious defense to Escamilla’s suit, namely, that
6 No. 22-2208

Escamilla’s admittance to an inpatient mental health unit un-
der New York state law qualified as a commitment for the
purposes of § 922(g)(4). See Cracco, 559 F.3d at 631 (affirming
decision to vacate default where defendant presented a de-
fense and the factual basis for it). Accordingly, the govern-
ment made the necessary showing at each step, and the dis-
trict court did not abuse its discretion in setting aside the en-
try of default.
 III
 We now proceed to Escamilla’s merits argument: that he
is not prohibited from possessing a firearm under § 922(g)(4)
because he was never committed to a mental institution. We
review the district court’s grant of summary judgment de
novo, construing the record in the light most favorable to Es-
camilla. James v. Hale, 959 F.3d 307, 314 (7th Cir. 2020).
 Our analysis is grounded in the statutory text of the appli-
cable federal and state law. As noted above, § 922(g)(4) pro-
hibits a person “who has been committed to a mental institu-
tion” from “receiv[ing] any firearm or ammunition which has
been shipped or transported in interstate or foreign com-
merce.” While the statute does not define the term, the ques-
tion of whether someone has been “committed to a mental in-
stitution” is a question of federal law. United States v. Waters,
23 F.3d 29, 31 (2d. Cir. 1994). To answer the federal law ques-
tion, we look to the state law that governed a person’s prior
commitment and then consider whether the state law “is con-
sistent with federal policy.” Id.; see also United States v.
Whiton, 48 F.3d 356, 358 (8th Cir. 1995); United States v.
Giardina, 861 F.2d 1334, 1335 (5th Cir. 1988). We also find
guidance in the ATF’s regulation defining the phrase:
No. 22-2208 7

 A formal commitment of a person to a mental
 institution by a court, board, commission, or
 other lawful authority. The term includes a
 commitment to a mental institution involuntar-
 ily. The term includes commitment for mental
 defectiveness or mental illness. It also includes
 commitments for other reasons, such as for drug
 use. The term does not include a person in a
 mental institution for observation or a volun-
 tary admission to a mental institution.
27 C.F.R. § 478.11. Because § 922(g)(4) is a criminal statute, we
are not required to defer to the ATF’s reading of the law,
United States v. Apel, 571 U.S. 359, 369 (2014), but nonetheless,
the ATF regulation merits some deference in light of the “spe-
cialized experience and broader investigations and infor-
mation available to the agency[.]” United States v. Mead Corp.,
533 U.S. 218, 234 (2001) (quoting Skidmore v. Swift & Co., 323
U.S. 134, 139 (1944)); see also United States v. McIlwain, 772
F.3d 688, 694 (11th Cir. 2014) (finding § 478.11 “helpful and
persuasive” in construing § 922(g)(4)). So, to have been “com-
mitted to a mental institution,” the admission must have been
(1) involuntary and (2) formally executed by a court, board,
commission, or other lawful authority.
 Escamilla argues that his 2018 hospitalization satisfies nei-
ther of these conditions. First, Escamilla argues that his ad-
mission was voluntary because he wanted to be there and
never tried to leave. But whatever his subjective intentions
were at the time, his admission was still involuntary under
New York law. Escamilla was admitted to Samaritan Hospital
on an emergency status under NYHML § 9.39(a), allowing the
director of a hospital to “receive and retain therein as a patient
8 No. 22-2208

for a period of fifteen days any person alleged to have a men-
tal illness for which immediate observation, care, and treat-
ment in a hospital is appropriate and which is likely to result
in serious harm to himself or others.” (emphasis added). For
a person to be admitted under this section, a staff doctor must
first perform an examination and find that he poses a safety
threat to himself or others. Id. For the hospital to retain a pa-
tient for more than forty-eight hours and up to fifteen days,
the law requires a second doctor who is a member of the psy-
chiatric staff to confirm the first doctor’s finding. Id.
 Samaritan followed this protocol when it admitted Esca-
milla. The doctor who conducted his initial evaluation deter-
mined that Escamilla posed a substantial risk of physical
harm to himself or others. Medical records show that he was
experiencing auditory hallucinations, depression, and sui-
cidal thoughts, and the doctor determined that he needed to
be admitted on an emergency basis under § 9.39. The next
day, Escamilla was examined by a second doctor who con-
firmed the first doctor’s finding. At that point, § 9.39(a) au-
thorized the hospital director to retain Escamilla for up to fif-
teen days, whether he wanted to be there or not.
 The Second Circuit and New York courts have uniformly
characterized admissions under § 9.39 as involuntary. See
Phelps v. Bosco, 711 F. App’x 63, 65 (2d Cir. 2018) (collecting
cases); Matter of Colihan v. State of New York, 211 A.D.3d 1432,
1436 (N.Y. App. Div. 2022) (collecting cases). Escamilla
acknowledges this case law but argues that when a patient
willingly receives care and treatment, an admission under
§ 9.39 can be considered voluntary in that particular circum-
stance. We disagree and join the Second Circuit and New
York courts in concluding that commitment under § 9.39 is
No. 22-2208 9

involuntary, regardless of the committed person’s subjective
intent. Doctors determined that Escamilla was likely to cause
serious harm to himself or others, leading to his involuntary
retention under the statute. See Matter of Colihan, 211 A.D.3d
at 1434 (finding that the petitioner’s admission under § 9.39
was involuntary because a doctor determined that he was a
risk to himself). Escamilla’s commitment under § 9.39 was for
his own safety because it prevented him from suddenly
changing his mind, walking out, and harming himself or
someone else.
 Escamilla’s contrary argument, based on § 9.39(b), is un-
persuasive. That subsection provides that if it is determined
that a patient is not in need of involuntary care or treatment
within fifteen days of arrival at the hospital, he must be dis-
charged “unless he agrees to remain as a voluntary or infor-
mal patient.” Escamilla contends that the word “remain”
demonstrates that a patient’s status under § 9.39 is voluntary
unless and until it is determined that the person needs invol-
untary care. But this ignores the more straightforward mean-
ing of the word “remain” within the context of the sentence—
it relates not to the patient’s pre-existing status but to his con-
tinued physical presence at the hospital. In other words, if a
patient who has been involuntarily admitted under § 9.39
does not continue to need involuntary care, he may choose to
stay—to “remain”—at the hospital to receive care on a volun-
tary or informal basis. Section 9.39(b) does not suggest that
commitment is voluntary under § 9.39.
 Our reading is further supported by other provisions of
the NYMHL. For example, if Escamilla’s hospitalization had
been deemed voluntary, he would have been admitted under
§ 9.13, which governs “Voluntary Admissions.” To be
10 No. 22-2208

admitted as a voluntary patient, a person may simply “make
[a] written application” for care and treatment. § 9.13(a). If the
voluntary patient later decides to leave the hospital, the hos-
pital director must “promptly release the patient.” § 9.13(b).
Because Escamilla was admitted under § 9.39—not § 9.13—he
could have been “retained” for fifteen days and thus his ad-
mission was involuntary.
 Escamilla also argues that he does not meet the regula-
tion’s second requirement because he was not formally com-
mitted “by a court, board, commission, or other lawful au-
thority.” 27 C.F.R. § 478.11. He maintains that formal commit-
ment requires some judicial involvement and thus, he is not
prohibited from possessing firearms under § 922(g)(4). But
under the plain terms of the regulation, commitment by a
court is sufficient but not necessary—commitment by “other
lawful authority” will do, with or without judicial interven-
tion. And here, the hospital director (through its staff) com-
mitted Escamilla under “other lawful authority.” The New
York legislature, through NYMHL § 9.39, delegated to hospi-
tal directors the lawful authority to commit patients alleged
to have a mental illness who are likely to cause serious harm
to themselves or others. Our interpretation comports with the
Second Circuit’s decision in United States v. Waters, which
held that judicial involvement is not necessary for a commit-
ment under § 922(g)(4). 23 F.3d at 31, 36.
 We also note that such commitments are not shielded from
the state judiciary altogether. Patients admitted under § 9.39
must be given a notice advising them of their right to request
a court hearing. NYMHL § 9.39(a). The patient, any relative,
friend, or the mental hygiene legal service may give such writ-
ten request to the director of the hospital who must then
No. 22-2208 11

forward a copy of the request to the local supreme court or
county court. Id. Upon receipt of the request, the court must
hold a hearing within five days. Id. At the hearing, the court
must examine the patient, hear testimony, and decide
whether there is reasonable cause to believe the patient poses
a safety threat and that continued treatment is appropriate. Id.
If such a determination is made, the court issues an order au-
thorizing the continued retention. Id. Such robust protections
certainly indicate that admission under § 9.39 is formal and
lawful. Notably, no such procedural protections exist for vol-
untary admissions under § 9.13, further suggesting that com-
mitment under § 9.39 is involuntary.
 In sum, because Escamilla was involuntarily “committed
to a mental institution” by lawful authority, § 922(g)(4) pro-
hibited him from possessing a firearm. Accordingly, we af-
firm the district court’s grant of summary judgment to the
government.
 IV
 Lastly, we address the issue of taxed costs. We review a
district court’s awarding of costs for abuse of discretion. Har-
ney v. City of Chicago, 702 F.3d 916, 921 (7th Cir. 2012) (citation
omitted).
 Costs are taxed against a losing party. Fed. R. Civ.
P. 54(d)(1); 28 U.S.C. § 1920. Taxable costs include “[f]ees of
the court reporter for all or any part of the stenographic tran-
script necessarily obtained for use in the case.” 28 U.S.C.
§ 1920(2). Here, the government ﬁled a bill of costs for $449.10,
all associated with Escamilla’s deposition. The deposition
transcript was taxed at $289.10 ($4.90 per page, for 59 pages).
The remaining $160 was for the court reporter’s attendance at
12 No. 22-2208

the deposition. The district court awarded the full $449.10. Es-
camilla argues that this award was improper for three rea-
sons.
 First, Escamilla argues that costs related to court reporter
attendance at a deposition are not taxable. That is incorrect,
and the $160 for the court reporter’s deposition attendance
was properly included in the taxed costs. See Cengr v. Fusibond
Piping Sys., Inc., 135 F.3d 445, 457 n.14 (7th Cir. 1998).
 Second, Escamilla contends the court erred in taxing the
deposition transcript at $4.90 per page instead of $3.65 per
page (the maximum rate set forth by the Judicial Conference).
See Transcript Rates, https://www.uscourts.gov/services-
forms/federal-court-reporting-program. The government
agrees with this point. Although we note that the Eastern Dis-
trict of Wisconsin does not have a rule establishing the Judi-
cial Conference rate as the maximum taxable rate, c.f. North-
ern District of Illinois Local Rule 54.1(b), it is nonetheless ap-
propriate in the absence of a showing that a departure is war-
ranted. Accordingly, the judge should have taxed the deposi-
tion transcript pages at the rate of $3.65, not $4.90.
 Third, the parties dispute how many pages are taxable.
The deposition transcript was 59 pages: 46 pages of tran-
scribed testimony, 10 pages of word indices, and 3 cover
pages. Escamilla argues that the deposition transcript should
have been taxed for only the 46 pages of transcribed testimony
rather than the full 59 pages. The government concedes that
the 3 cover pages should not have been taxed but argues that
it may have been proper to tax the 10 pages of word indices.
We acknowledge the split amongst the district courts on
whether the cost of printing word indices is recoverable. See,
e.g., In re Method of Processing Ethanol Byproducts and Related
No. 22-2208 13

Subsystems (’858) Patent Litig., No. 1:10-ml-02181, 2020 WL
240944, at *3 (S.D. Ind. Jan. 15, 2020) (collecting cases). In some
circumstances, word indices can be essential to understand-
ing the content of a deposition transcript. Accordingly, we
cannot say that the district court abused its discretion in in-
cluding the index pages with the transcript costs.
 Finally, the government’s bill of costs listed only a single
original transcript. The government argues that this invoice
was ﬁled in error and that it was actually billed for a copy of
the deposition transcript as well. Therefore, the government
contends that in addition to the cost for the original transcript,
the cost of its copy of the deposition transcript is also taxable.
But the government concedes that despite having a corrected
invoice at the time, it never ﬁled the corrected invoice with
the district court. Accordingly, the district court did not err in
taxing only those costs associated with the single original
transcript listed on the invoice that was ﬁled.
 We modify the award of costs to tax only 56 pages at a rate
of $3.65. After adding the cost of the court reporter’s attend-
ance, the proper adjusted taxed costs amount to $364.40.
 AFFIRMED WITH MODIFICATION TO COSTS