**KB HOME INDIANA INC.,**
**Appellant–Plaintiff,**

v.

**ROCKVILLE TBD CORP.,**
**Appellee–Defendant.**

No. 49A02–0909–CV–881.

Court of Appeals of Indiana.

June 18, 2010.

Peter J. Rusthoven, E. Sean Griggs, David M. Heger, Barnes & Thornburg LLP, Indianapolis, IN, Attorneys for Appellant.

Frank J. Deveau, Scott R. Alexander, Michael D. Chambers, Bradley R. Sugarman, Taft Stettinius & Hollister LLP, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Chief Judge.

Today we consider the delayed ramifications of a party's discharge of pollutants onto real property that was once farmland but subsequently became a residential subdivision. While the owner of the subdivision claims that it is entitled to recover damages for negligence, nuisance, and trespass, the defendant-company insists that the subdivision's actions against it are precluded under various theories, including the economic loss doctrine. The trial court sided with the defendant-company. We believe that the owner may proceed on the theory of negligence.

Appellant-plaintiff KB Home Indiana, Inc. (KB), appeals the trial court's grant of summary judgment in favor of appellee-defendant Rockville TBD Corp. (Rockville), on its claims for negligence, trespass, and nuisance as a result of chemical leakage from Rockville's predecessor's manufacturing site. Specifically, KB argues that the trial court erred in granting summary judgment with regard to these claims because a) the economic loss doctrine is not applicable in these circumstances; b) the designated evidence failed to establish that the damages to KB were not foreseeable as a matter of law with regard to the nuisance claim; and c) it was mistakenly assumed that a trespass occurred as soon as the chemical pollutants entered the land rather than when damages were ascertainable.

We conclude that the trial court erred in holding that the economic loss doctrine precludes KB from pursuing its negligence claims against Rockville. However, we affirm the trial court's entry of summary judgment for Rockville with respect to KB's claims against it for trespass and nuisance. As a result, we reverse in part, affirm in part, and remand this cause for trial on KB's negligence claim.

### FACTS[1]

Between 1969 and 1990, James Lyons owned and operated L&E, which was a company that manufactured airplane components, on Belmont Avenue (hereinafter referred to as the Site), in Indianapolis.

1. We heard oral argument in this case in Indianapolis on June 2, 2010. We commend counsel for their able presentations.

During the Lyonses' operation of the plant, a number of chemical solvents, including trichloroethylene (TCE), were used at the Site to clean metal parts. The TCE was discharged into the facility's septic system and ultimately "leached" into the surrounding environment. Appellant's App. p. 24.

In January 1989, George and Patricia Kopetsky purchased some unimproved farmland adjacent to the Site. Sometime in 1990, Ron and Clara Mears bought L&E's stock, and ownership of the company was transferred to the Mearses in 1991. However, L&E retained ownership of the business that operated at the Site. When the Mearses operated the facility—from August 1990 through February 1993—the TCE was collected in drums and removed by a licensed environmental service.

In March 1993, the manufacturing assets of L&E and the right to use the L&E name were sold to Ferco. As a result of this transaction, the selling corporate entity—L & E—changed the name of the company to Rockville. However, the Mearses still owned the land and leased it to Ferco. Following the sale, the Mearses had no involvement with the operation of the business. After Ferco assumed control of the Site, several gallons of TCE were released onto the Site property. However, all use of TCE at the Site had ceased sometime in 1993. In connection with the 1993 sale of the assets to Ferco, an environmental investigation of the Site was performed. The investigation revealed that the septic tank and septic finger system on the eastern portion of the Site had been affected by solvents, including TCE.

In 1995, Rockville executed a voluntary remediation agreement with the Indiana Department of Environmental Manage-

ment (IDEM). The following year, Rockville submitted a remediation report to IDEM, which noted that the use of the septic system had been permanently discontinued and that water from the facility operations was now being discharged to the municipal sewer system. The 1996 sampling data disclosed TCE amounts far below voluntary remediation program levels. IDEM reviewed the report and ultimately issued a "Certificate of Completion" to Rockville for the successful conclusion of the voluntary remediation that was conducted at this portion of the Site. Appellant's App. p. 129.

From July through October 1997, additional investigations were conducted at the Site. At that time, TCE was discovered in areas west of the main facility that were outside the area that had been previously investigated and remediated. Indeed, the contamination plume had migrated through portions of the Kopetskys' property. Rockville performed additional sampling in June 1998 in an effort to identify the source of the contamination.

The Kopetskys platted about 200 lots for residential development. In November 1998, the Kopetskys and KB [2] entered into a lot purchase and option agreement to develop that land into a residential subdivision known as Cedar Park. The designated evidence established that the Kopetskys had never performed an environmental assessment or chemical investigation of Cedar Park.

Commencing in 1999, KB began purchasing lots in Cedar Park from the Kopetskys for the purpose of contracting with home buyers. Although it is standard practice to perform environmental due dili-

---

**2.** The contract was actually executed between KB's predecessor, Dura Builders, and the Kopetskys. Dura Builders was subsequently ac-

quired by KB in 2004. Appellant's App. p. 134.

gence before developing land to construct homes, neither KB nor its predecessor—Dura Builders—conducted environmental assessments of the property before purchasing lots or building any homes in Cedar Park.

Kopetsky represented to KB that the Cedar Park land was free of any hazardous materials and promised that he would, at each closing, execute a vendor's affidavit certifying the environmental condition of the lot. The affidavits stated, in part, that "the Real Estate ... contains no ... toxic or hazardous waste or materials, and that no disclosure statement under ... [the Indiana Responsible Property Transfer Law], is required for this transaction." Appellant's App. p. 242. Kopetsky also represented to his lender that "after due investigation and inquiry, the [Cedar Park] Property is not and has not been a site for the ... presence of contaminants." *Id.*

In August 2000, Kopetsky gave Cedar Park's environmental consultant permission to conduct soil boring and ground water sampling activities on the property. As a result, various "monitoring wells" were installed on Kopetsky's land in the fall of 2001. Appellee's App. p. 180. It was determined that certain areas of the Cedar Park subdivision, including some areas that KB owned, were impacted by TCE-contaminated groundwater. Because of the presence of low levels of TCE in the groundwater, Alt & Witzig—an environmental firm—initially proposed deed restrictions to address off-site contamination on the Kopetskys' property. Those restrictions would have prohibited the use of groundwater for residential purposes.

By February 2002, Kopetsky's attorney had asked to meet with representatives of Alt & Witzig to obtain information and test results from the various monitoring wells on the property. On May 1, 2002, Kopetsky was provided with test results showing TCE contamination in Cedar Park. Later that month, Kopetsky notified IDEM of his concerns regarding the contamination and told his insurance carrier of the problems in July 2002. Kopetsky also retained an environmental attorney, who informed him that "the environmental cloud over [the] property is a very significant problem." Pl. Ex. 1. Kopetsky continued to collect information about the contamination, and when Cedar Park proposed remediating the contamination to non-residential standards, Kopetsky objected because he wanted to sell the property for residential use. Notwithstanding the information that Kopetsky learned, he did not give any information to KB and continued selling the lots. In April 2004, Kopetsky notified IDEM that he would not accept any proposed deed restrictions on the property.

Although Kopetsky told IDEM representatives that a significant portion of the property had been impacted by TCE contamination, he attempted to sell lots directly to Cedar Park in 2004, claiming that "38 lots to the south of [a dividing] line ... show evidence of impact of the release of chlorinated solvents." Pl. Ex. 28.

KB became aware of the contamination in March 2005 after it conducted an environmental investigation. As a result, KB constructed no new homes in Cedar Park. Because KB halted construction, the subdivision contains empty lots scattered among finished and occupied homes. KB ultimately left the Indianapolis market in 2007 in light of the economic housing conditions.

On June 29, 2007, KB filed a complaint against Rockville, Mears, Kopetsky, and Patriot, an environmental engineering firm, for damages to the Cedar Park property as a result of the chemical leakage from the Site. The complaint alleged counts against the various defendants for negligence, trespass, nuisance, environ-

mental legal action, breach of contract, and constructive fraud. KB's action against Rockville included claims for negligence, trespass, and continuing nuisance. KB requested compensatory damages and amounts for:

a) Reduction in value of its property as a result of the TCE contamination;

b) KB's legal fees;

c) Fees paid to KB's environmental consultants;

d) Fees paid in connection with maintaining lots and homes;

e) Interest on the capital investment made unproductive by the contamination; and

f) Residual damages that may affect the value of KB's property after it has been repaired and/or restored to its pre-contamination condition.

Appellant's App. p. 140–41.

KB's complaint against Rockville for negligence included the following allegations:

61. The [Defendants] had a duty to control and maintain the [Site] and/or their operations on the [Site] in a non-polluting manner. The ... defendants had a duty not to permit or allow hazardous substances to invade adjacent properties. Further, the ... defendants had a duty to respond promptly to any release of contaminants in a manner that would prevent or mitigate further migration of contaminants. Upon learning of the migration of the contaminants, the ... defendants had a duty to take action to stop migration and remediate the contamination.

62. The ... defendants have breached these duties by their negligent acts and omissions in operating and maintaining the [Site], by their failure to implement safeguards to assure against the release of contaminants, by their failure prompt-

ly and effectively to address the release of contamination, and by their failure to prevent further migration of the contaminants.

*Id.* at 28.

KB's trespass claim asserted that it "has suffered and continues to suffer damages, including ... diminution in the value of [its] property." *Id.* at 141. Finally, KB's claim for continuing nuisance alleged that it sustained damages to the property, diminution in the value of their property, and "lessened personal enjoyment of their property" because Rockville's

contamination of the air, soil, soil vapor, and groundwater and their failure to address such contamination constituted an unreasonable, unwarranted and unlawful use of the ... property that has obstructed KB's free use of its property. Pursuant to Ind.Code Section 32–30–6–6, such conduct constitutes a nuisance.

*Id.* at 31. As a result, KB contended that it was entitled to maintain an action to enjoin or abate the nuisance and recover damages.

Thereafter, Rockville filed separate motions for summary judgment on the negligence, trespass, and nuisance claims. Rockville argued that because KB requested purely economic damages on the negligence count, the economic loss doctrine precludes KB from recovering additional damages. Moreover, Rockville asserted that it was not the proximate cause of KB's alleged damages because Dura Builders—KB's predecessor—and Patriot failed to conduct an adequate assessment of Cedar Park. Thus, Rockville maintained that those actions "constitute an intervening cause that breaks the chain of causation between Rockville and any resulting damages." Appellant's App. p. 90.

Rockville also contended that it is entitled to judgment as a matter of law on

KB's nuisance claim because it could not have foreseen any harm to KB at the time of the conduct that allegedly caused the nuisance, Rockville and KB did not simultaneously own or use their properties, and KB is merely an absentee landowner and cannot recover for lessened enjoyment of property under a nuisance claim, and there is no contamination in twelve of the lots.

Finally, with regard to the trespass claim, Rockville argued that because KB did not own any lots in 1997—the time by which the contamination in Cedar Park had occurred—KB cannot maintain a trespass claim against it. Moreover, Rockville contended that it did not commit any continuing tortious activity while KB possessed or owned the Cedar Park lots. Rockville asserted that "all alleged tortious activity of releasing, dumping, or spilling TCE occurred well before KB's initial Cedar Park lot purchases in 1999." *Id.* at 71.

Following argument on the motions, the trial court granted summary judgment for Rockville on all of KB's claims. The trial court determined that KB's negligence claims were barred as a matter of law under the economic loss doctrine, and that the damages to KB were not foreseeable by Rockville in accordance with the nuisance claim because "KB ... did not suffer its alleged damages until at least fifteen years after any significant releases at the Site, and at least eleven years after Rockville ceased operating at the Site." *Id.* at 17. Finally, the trial court determined that the trespass claim was barred as a matter of law because KB was not in possession of its land at the time of the alleged trespass. KB now appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

On appeal, the standard of review of a summary judgment ruling is the same as that used in the trial court: summary judgment is appropriate only where the evidence shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Shell Oil Co. v. Lovold Co.*, 705 N.E.2d 981, 983–84 (Ind.1998). All facts and reasonable inferences drawn from those facts are construed in favor of the non-moving party. *Colonial Penn Ins. v. Guzorek*, 690 N.E.2d 664, 667 (Ind.1997). The review of a summary judgment motion is limited to those materials designated to the trial court. T.R. 56(H); *Rosi v. Bus. Furniture Corp.*, 615 N.E.2d 431, 434 (Ind. 1993). We must carefully review decisions on summary judgment motions to ensure that the parties are not improperly denied their day in court. *Estate of Shebel v. Yaskawa Elec. Am., Inc.*, 713 N.E.2d 275, 277 (Ind.1999). However, we will affirm the grant of summary judgment if it is sustainable on any theory or basis found in the evidentiary matter designated to the trial court. *Stelko Elec., Inc. v. Taylor Cmty. Sch.*, 826 N.E.2d 152, 155 (Ind.Ct. App.2005).

We also note that where a trial court enters findings of fact and conclusions thereon in granting a motion for summary judgment, as the trial court did in this case, the entry of specific findings and conclusions does not alter the nature of our review. *Rice v. Strunk*, 670 N.E.2d 1280, 1283 (Ind.1996). In the summary judgment context, we are not bound by the trial court's specific findings of fact and conclusions thereon. *Id.* They merely aid our review by providing us with a statement of reasons for the trial court's actions. *Id.*

### II. KB's Claims

#### A. Negligence

KB argues that the trial court erred in granting Rockville's motion for summary judgment on its negligence claim

because its allegations do not involve "any contract law or other claim as to any product or service." Appellant's Br. p. 6. Therefore, KB contends that the trial court erroneously determined that the economic loss doctrine barred its negligence claim as a matter of law.

 In resolving this issue, we note that the central theory underlying "economic loss" is that "the law should permit the parties to a transaction to allocate the risk that an item sold or a service performed does not live up to expectations." *Gunkel v. Renovations, Inc.*, 822 N.E.2d 150, 151 (Ind.2005). We agree with the Supreme Court of Wisconsin's observation in *1325 N. Van Buren, LLC v. T-3 Group, Ltd.*, 293 Wis.2d 410, 716 N.W.2d 822, 831 (2006), where it noted that the principles underlying application of the economic loss doctrine to tort actions are "(1) to maintain the fundamental distinction between tort law and contract law; (2) protect commercial parties' freedom to allocate economic risk by contract; and (3) to encourage the party best situated to assess the risk [of] economic loss, the commercial purchaser, to assume, allocate, or insure against that risk."

 In accordance with this doctrine, contract is the sole remedy for the failure of a product or service to perform as expected. *Gunkel*, 822 N.E.2d at 152. The *Gunkel* court also explained the economic loss doctrine's development in products liability cases:

> This doctrine was first applied in Indiana before the Products Liability Act was amended to govern negligence claims as well as strict liability. *Reed v. Central Soya Co., Inc.*, 621 N.E.2d 1069 (Ind.1993), *modified on other grounds*, 644 N.E.2d 84 (Ind.1994), was a Prod-

ucts Liability Act case. The Products Liability Act at that time excluded recovery for "economic damage." Reed explained that under this doctrine, contract is the only available remedy "where the loss is solely economic in nature, as where the only claim of loss relates to the product's failure to live up to expectations, and in the absence of damage to other property or person." *Id.* at 1074–75. This was reiterated in *Martin Rispens & Son v. Hall Farms, Inc.*, 621 N.E.2d 1078 (Ind.1993), which involved claims under the Products Liability Act and also claims for breach of contract and negligence. In addressing the negligence claim we held that: "Economic losses are not recoverable in a negligence action premised on the failure of a product to perform as expected unless such failure causes personal injury or physical harm to property other than the product itself." *Id.* at 1091 . . . .

In sum, Indiana law under the Products Liability Act and under general negligence law is that damage from a defective product or service may be recoverable under a tort theory if the defect causes personal injury or damage to other property, but contract law governs damage to the product or service itself and purely economic loss arising from the failure of the product or service to perform as expected. In this respect, Indiana law is consistent with admiralty law, and the law of most other states. "Economic losses" occur when there is no personal injury and no physical harm to other property. Rather these losses are viewed as disappointed contractual or commercial expectations.

*Id.* at 152–54 (footnotes and other citations omitted).[3]

---

**3.** We recently reviewed the principles set forth in *Gunkel* regarding the application of

the economic loss doctrine in litigation that arose from the renovation and expansion of

■ In addition, we previously observed in *Choung v. Iemma*, 708 N.E.2d 7 (Ind. Ct.App.1999), that if the plaintiff is not seeking damages involving the benefit of the bargain or other matters governed by contract and/or related principles, the economic loss doctrine does not bar a negligence action. For example, the *Choung* court recognized that the damages to an automobile wrecked by reason of its own bad brakes, as well as damages to other property in the vicinity, are compensable through an action in negligence. *Id.* at 13. More specifically:

> "Where there is no accident, and no physical damage, and the only loss is a pecuniary one, through loss of value, or use of the thing sold, or the cost of repairing it, the courts have adhered to the rule ... that purely economic interests are not entitled to protection against mere negligence, and so have denied recovery."

*Id.* (quoting *Jordan v. Talaga*, 532 N.E.2d 1174, 1181 (Ind.Ct.App.1989)). Finally, to recover in negligence there must be a showing of harm above and beyond disappointed expectations. A buyer's desire to enjoy the benefit of his bargain is not an interest that tort law traditionally protects. *Jordan*, 532 N.E.2d at 1181.

To further illustrate, we note that in *Runde v. Vigus Realty, Inc.*, 617 N.E.2d 572 (Ind.Ct.App.1993), the defendant persuaded the trial court that the economic loss doctrine barred any recovery for negligence even though there was no contractual relationship between the parties. In reversing, this court explained that

> *Jordan [v. Talaga]* and the rule it states appears to pertain to a negligence action for economic loss to a product caused by a defect in the product. This limitation

is consistent with the fact that the economic loss rule is described as a rule that prevents tort recovery when a product defect has resulted in the loss of value or use of the thing sold or has caused the buyer to incur the cost of repair.

*Id.* at 575.

In this case, it is undisputed that KB did not contract with Rockville to purchase property or a product. KB did not assert any product liability or comparable claim, and there is no showing that KB is seeking to circumvent any contractual, statutory, or other limits on the nature or scope of its permissible recovery against Rockville. Additionally, the contract claims that KB might assert against Kopetsky—the vendor—are subject to the limitations that applicable contract law might impose, which are not evaded by pleading those claims against KB under a negligence label. In other words, Kopetsky's breach of warranty that the land was free of hazardous materials does not absolve Rockville of responsibility for *its* negligent conduct that may have caused the contamination. Similarly, the contract claims that KB has asserted against Patriot—the environmental consultant—have nothing to do with the non-contract claims against Rockville.

In light of these circumstances, we must conclude that the trial court erred in concluding that the economic loss doctrine precludes KB from pursuing its negligence claim against Rockville. Thus, we reverse the trial court's grant of summary judgment for Rockville on KB's negligence claim against it.

### B. Nuisance

■ KB next claims that the trial court erred in granting summary judgment for

the Indianapolis Central Public Library. *Indianapolis–Marion Cty. Pub. Library v. Charlier Clark & Linard, P.C.*, 900 N.E.2d 801, 809–

12 (Ind.Ct.App.2009), *trans. granted.* Although our Supreme Court granted transfer in that case, no decision has been issued.

Rockville on its nuisance claim. Specifically, KB argues that the trial court erroneously determined that the damages to KB's property were not "foreseeable" as a matter of law. Appellant's Br. p. 10.

Indiana Code section 32–30–6–6 defines a nuisance as:

Whatever is:

(1) injurious to health;

(2) indecent;

(3) offensive to the senses; or

(4) an obstruction to the free use of property;

so as essentially to interfere with the comfortable enjoyment of life or property . . .

An action to abate or enjoin a nuisance may be brought by a person whose "(1) property is injuriously affected; or (2) personal enjoyment is lessened . . . by the nuisance." I.C. § 32–30–6–7(a). Moreover, Indiana Code section 32–30–6–8 provides that "[i]f a proper case is made, the nuisance may be enjoined or abated and damages recovered for the nuisance."

 Our Supreme Court has held that "a nuisance is an activity that generates injury or inconvenience to others that is both sufficiently grave and sufficiently foreseeable that it renders it unreasonable to proceed at least without compensation to those that are harmed." *City of Gary v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1231 (Ind.2003) (citing *Owen v. Phillips*, 73 Ind. 284 (1881)). When determining what constitutes a nuisance, the question is whether it is reasonable to believe that the situation would naturally produce physical discomfort "to persons of ordinary sensibilities, tastes, and habits." *Gray v. Westinghouse Elec. Corp.*, 624 N.E.2d 49, 54 (Ind.Ct.App.1993). The essence of a nuisance claim is the foreseeable harm unreasonably created by the defendant's conduct. *Smith & Wesson*, 801 N.E.2d at

1235. Moreover, the determination of whether resulting harm is foreseeable such that liability may be imposed on the original wrongdoer is a question of fact for the jury. *Paragon Family Rest. v. Bartolini*, 799 N.E.2d 1048, 1055 (Ind.2003). The pertinent inquiry is not whether the defendant could foresee precisely how a particular plaintiff would be harmed at a particular time. Rather, the issue is whether the defendant could reasonably foresee the type of harm likely to result from the wrongful conduct.

To illustrate, in *N. Ind. Transit, Inc. v. Burk*, our Supreme Court determined that

It was not necessary that the defendant should have foreseen the precise manner in which the accident might result. We think that it could have been found that in its general nature, what actually occurred was a probable consequence of the defendant's negligence, when all the attendant circumstances are considered, and that it was not something which was only remotely and slightly probable.

228 Ind. 162, 178, 89 N.E.2d 905, 911–12 (1950).

KB correctly points out that a very common delay between polluting conduct and discovery of its latent impact is a precise reason why today's environmental law looks "backwards," to impose responsibility on those who caused the pollution. *See Gray*, 624 N.E.2d at 51–53 (upholding the sufficiency of a nuisance claim for environmental damage to real property in an instance where the defendants' last disposal of toxic chemicals occurred in 1962 and the complaints were not filed until 1985).

That said, it is readily apparent that adjoining land may be harmed by leaking chemical pollutants, regardless of whether discovery of the harm occurs when the land is being used to build a home, or a school, or for any other permissible use of

real property. Put another way, it is indisputable that the environmental damage to KB's property is precisely the type of harm that a reasonable person would foresee from Rockville's release of dangerous pollutants. Hence, it does not follow that Rockville could not have foreseen the environmental harm that its polluting conduct could cause merely because of Kopetsky's failure to disclose and Dura Builders' and an environmental engineering firm's subsequent failure to discover the harm. And it was not Kopetsky's failure to disclose the environmental harm caused by Rockville's release of the pollutants on the property that was the cause of the harm. In short, the designated evidence establishes that Rockville's release of the chemicals caused the harm. Thus, we must conclude that the trial court erred in granting Rockville's motion for summary judgment on KB's nuisance claim on the basis that the harm was not foreseeable.

However, our inquiry does not end here. As noted above, Rockville's operations at the Site ceased in 1993, Dura did not begin purchasing lots until 1999, and KB did not own lots in the subdivision until 2004. As set forth in Indiana Code section 32–30–6–8, a plaintiff may pursue an action in nuisance "to abate or enjoin a nuisance." Notwithstanding our decision in *Gray* acknowledging that a party causing the nuisance can be held liable regardless of whether the party owns or possesses the property on which the nuisance originates, we did not discuss the effects of the dumping of contaminants that began prior to the plaintiff's occupation of the adjacent land or the fact that the dumping had ceased more than 23 years before the plaintiff initiated his nuisance claim.

█ A nuisance claim generally contemplates an action that is designed to cease or lessen the defendant's continued offensive behavior. *See, e.g., Lever Bros.*

*Co. v. Langdoc,* 655 N.E.2d 577, 583–84 (Ind.Ct.App.1995) (holding that a plant operator was liable for nuisance in connection with the discharge of an unlawful amount of waste into a public sewer system that caused property damage to tenant of neighboring building; by such discharge, operator used property to detriment of another); *Hays v. Hartfield L–P Gas,* 159 Ind.App. 297, 301, 306 N.E.2d 373, 376, (1974) (observing that a condition created by one landowner and causing another reasonably to be in constant fear for the safety of his life or property is a serious interference which constitutes a nuisance); *Major v. Miller,* 165 Ind. 275, 275, 75 N.E. 159, 160, (1905) (holding that a slaughterhouse which is so occupied and conducted that it creates nauseous and offensive smells, which are carried by the atmosphere into neighboring houses so as to prevent the enjoyment thereof, constitutes a nuisance). And in *Stein v. City of Lafayette,* 6 Ind.App. 414, 33 N.E. 912, 913–14 (1893), this court determined that the purchaser of a city lot had no cause of action against the city for damages caused by its previous wrongful change in the grade of an adjoining alley, since, as the change of grade constituted a permanent injury to the lot, damages therefore accrued to the then owner of the lot, and the right to sue did not pass to the purchaser.

Again, the designated evidence showed that Rockville's contamination of the property ceased in 1993 and it sold the property to a subsequent purchaser. Thus, under these circumstances, KB has failed to show that a nuisance existed or was ongoing that could be abated or enjoined. Put another way, the damage has already been done, and KB's cause of action against Rockville sounds in negligence. As a result, we conclude that the trial court properly granted Rockville's motion for sum-

mary judgment on KB's nuisance claim against it.

## C. Trespass

██ KB also argues that the trial court erred in granting Rockville's motion for summary judgment on its trespass claim. Specifically, KB maintains that the trial court erroneously determined that its trespass action is barred because Rockville was not in possession of the property when the alleged trespass occurred.

██ A plaintiff is generally required to establish two elements when pursuing a trespass claim. First, the plaintiff must show that he possessed the land when the alleged trespass occurred. Second, the plaintiff must demonstrate that the trespassing defendant entered the land without a legal right to do so. *See Garner v. Kovalak*, 817 N.E.2d 311, 313 (Ind.Ct.App. 2004).

As the uncontested facts make clear, the Kopetsky Property, which later became Cedar Park, was contaminated with TCE before Dura Builders purchased its first lot in 1999 and well before KB purchased Dura Builders in 2004. No TCE was used or released at the Site after 1993 and the TCE-contaminated groundwater had migrated through all of the Cedar Park subdivision by 1997. Thus, the activity giving rise to the trespass, i.e., the release of TCE at the Site, ended long before KB possessed any Cedar Park property.

Notwithstanding these circumstances, KB asserts that its action for trespass against Rockville did not arise until August 2004 because there was no ascertainable damage prior to that time. KB directs us to *Cooper Indus., LLC v. City of S. Bend*, 899 N.E.2d 1274, 1284 (Ind.2009), in support of its proposition that it had no right to sue until the element of ascertainable damage was present.

In *Cooper*, the City of South Bend sued Cooper Industries to recover its costs of cleaning up the former Studebaker manufacturing site it had acquired during the mid–1980s. South Bend filed suit in March 2003 alleging common law claims of negligence, trespass, nuisance, and a statutory claim under the Environmental Legal Action (ELA) statute. *Id.* at 1277–78.

Thereafter, Cooper moved for summary judgment on all claims, asserting that they were time-barred. *Id.* at 1278. Although the trial court denied Cooper's motion, we reversed and determined that all of South Bend's claims were barred by the applicable six-year statute of limitations. *Cooper Indus., LLC v. City of South Bend*, 863 N.E.2d 1253 (Ind.Ct.App.2007), *trans. granted.* On transfer, our Supreme Court agreed that South Bend's common law claims—including trespass—were time barred because it knew of its damages from multiple environmental investigation reports that dated back to 1986. *Cooper*, 899 N.E.2d at 1280. Thus, contrary to KB's contention, it was not decided whether South Bend had a legally sufficient trespass claim. Rather, it was determined that South Bend's claim under the ELA was timely because it could not accrue before that statute was enacted in February 1998. *Id.* at 1286–87.

Similarly, we reject KB's reliance on *Pflanz v. Foster*, 888 N.E.2d 756 (Ind. 2008), in support of its contention that a trespass does not occur until that claim accrues. Pflanz did not involve a trespass claim. Rather, the plaintiff sought to recover its costs under Indiana's Underground Storage Tank Act (USTA) and damages under a negligence theory. *Id.* at 758. And the rule announced in *Pflanz* only considered the issue of when the statute of limitation began to run for contribution, negligence, and "stigma" damage claims under the USTA. *Id.* at 758–61.

In essence, KB has failed to show a departure from the long-established principle that a party must possess the land at the time of the activity that causes the alleged trespass. Simply put, because KB did not have possession of the land at the time of the alleged trespass, KB did not have a trespass cause of action against Rockville. Therefore, we conclude that the trial court properly entered summary judgment for Rockville on the trespass claim.[4]

The judgment of the trial court is affirmed in part, reversed in part, and remanded for trial on KB's negligence claim.[5]

DARDEN, J., and CRONE, J., concur.

**4.** We disagree with KB's assertion that "no one" has a remedy against Rockville for trespass. Indeed, the record shows that Kopetsky, who possessed the property at the time of the alleged trespass, brought a trespass action against Rockville in a related action. The trial court denied Rockville's motion for summary judgment on that claim because Kopetsky owned the property at the time of the alleged trespass. Appellee's App. p. 204.

**5.** As an aside, we note that Rockville asserted in its Statement of the Case that KB has not appealed the ruling as to Mears and that our decision in this case should not impact the ruling in his favor. Notwithstanding this contention, the trial court's summary judgment ruling expressly includes "Ronald Mears" in "collectively" defining "Rockville." Appellant's App. p. 13. Moreover, every Rockville summary judgment motion and brief addressed by the trial court's ruling begins by "collectively" defining "Rockville" to include "Ronald Mears."

Although Rockville asserts that it is the only appellee that is "properly" before us in this appeal, Rockville's briefing makes no distinction between the legal positions of Mears and Rockville on the issues addressed on summary judgment. The trial court's final order also directed the entry of judgment on the ruling, without leaving it "non-final" as to any party whose claims were resolved by that ruling. In our view, Rockville is attempting to elevate form over substance. Thus, we decline Rockville's request for leave to "reopen" the briefing so Mears can file a separate appellate brief.