In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 14-3306 & 14-3315

JMB MANUFACTURING, INC.,
d/b/a SUMMIT FOREST PRODUCTS COMPANY,
       *Plaintiff/Counterclaim-Defendant-Appellant/Cross-Appellee,*

*v.*

CHILD CRAFT, LLC, *et al.,*

                              *Defendants-Appellees,*
                  *and*

HARRISON MANUFACTURING, LLC,
f/k/a CHILD CRAFT, LLC,
       *Defendant/Counterclaim-Plaintiff-Appellee/Cross-Appellant,*

*v.*

RON BIENIAS,
              *Counterclaim-Defendant-Appellant/Cross-Appellee.*

———————————

Appeals from the United States District Court for the
Southern District of Indiana, New Albany Division.
No. 4:11-cv-00065-TWP-WGH — **Tanya Walton Pratt**, *Judge.*

———————————

ARGUED APRIL 22, 2015 — DECIDED AUGUST 24, 2015

_____

Before FLAUM, MANION, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. This case presents a merchant's creative effort to avoid the limited remedies that contract law provides for a seller's delivery of non-conforming goods. After the seller delivered about $90,000 worth of non-conforming wood products, the buyer sought recovery from both the seller and its president personally for tort damages on a tort theory, that they negligently misrepresented the quality of the delivered goods.

The district court ruled in favor of the buyer and award-ed damages of more than $2.7 million on the theory that the non-conforming goods caused the complete destruction of the buyer's business. This damages theory echoed the prov-erb of *Poor Richard's Almanack* ("A little neglect may breed mischief; for want of a nail, the shoe was lost; for want of a shoe the horse was lost; for want of a horse the rider was lost; for want a rider the battle was lost."), and Shakespeare's story of *Richard III*, where the loss of a horse led in turn to the loss of a battle, the death of a king, and the loss of a kingdom. Cf. *Hadley v. Baxendale*, 9 Exch. 341, 156 Eng. Rep. 145 (1854) (damages for breach of contract limited to conse-quences reasonably contemplated by both parties when they made contract).

We reverse the award of damages against the seller and the seller's president, but for reasons that do not depend on the flawed "want of a nail" theory. Under Indiana law, a buyer who has received non-conforming goods cannot sue a seller for negligent misrepresentation to avoid the economic

loss doctrine, which limits the buyer to contract remedies for purely economic losses. See *Indianapolis-Marion County Public Library v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722 (Ind. 2010). Second, there is no basis for transforming the buyer's breach of contract claim into a tort claim for negligent misrepresentation to hold the seller's president personally liable. See *Greg Allen Construction Co., Inc. v. Estelle*, 798 N.E.2d 171 (Ind. 2003). In all other respects, we affirm the judgment of the district court.

I.  *Factual and Procedural Background*

   A.  *The Parties and Their Contracts*

Child Craft Industries, an Indiana business run by the Suvak family since 1911, manufactured furniture for young children and infants. At the height of its success in the 1990s, it employed approximately 1,200 workers. After changes in the industry and a devastating flood in 2008, Child Craft Industries was acquired by defendant and counterclaim-plaintiff Child Craft, LLC, which is now known as Harrison Manufacturing, LLC. (Like the district court, we call this new entity "Child Craft.") Counterclaim-defendant Ron Bienias is the owner and president of plaintiff and counterclaim-defendant JMB Manufacturing, Inc., which does business as Summit Forest Products Company. (Like the district court, we call the company "Summit.")

Before 2008, Child Craft Industries and Bienias had a long-standing business relationship. After Child Craft assumed control of Child Craft Industries, Child Craft contracted with Summit to supply raw wood components for Child Craft's new planned line of high-end baby furniture

called the "Vogue Line." Child Craft made clear that it had specific quality requirements and an inflexible timeline.

Summit did not actually manufacture the wood components itself. Instead, it sourced the goods from an Indonesian manufacturer named P.T. Cita. Beginning in August 2008, Child Craft contracted with Summit through a series of purchase orders to buy raw wood components for cribs and "case goods" (such as bureaus and night stands). Child Craft and Summit understood that Summit would buy the components from P.T. Cita and re-sell them to Child Craft. Child Craft would then finish and assemble the components into furniture and sell the finished products to retailers.

At Bienias's request, Child Craft agreed not to have direct contact with P.T. Cita. Keeping its promise, Child Craft did not communicate with P.T. Cita, except on one occasion in September 2008, when Bienias and two Child Craft managers traveled to Indonesia together to inspect P.T. Cita's manufacturing facilities and to explain Child Craft's quality specifications.

In late 2008 and early 2009 Child Craft issued several purchase orders to Summit calling for a variety of case goods and baby crib components worth about $90,000 in total. Each purchase order included a detailed list of specifications. For purposes of the lawsuit, the most relevant item was that the moisture content of the wood products needed to be between 6% and 8%. (Furniture made with moist wood is prone to warp and split.)

A detailed rundown of the back and forth between Summit and Child Craft is not necessary for these appeals. Suffice it to say that the goods shipped to Child Craft never

conformed to its specifications, in spite of Bienias's assurances that they would. Among other problems, many of the wood products had a moisture content well above the desired range of 6% to 8%. Child Craft identified the goods as defective upon receipt and refused to pay Summit for the shipments. It also spent considerable time trying to re-work the products before eventually giving up.

By the end of their relationship in the spring of 2009, Child Craft had not received any usable cribs from Summit. As a result, Child Craft was forced to cancel orders it had received for its products and was never able to sell any furniture in the Vogue Line. Child Craft burned through its remaining capital and ceased operations in June 2009.

B. *Procedural History*

Ironically, in light of the district court's final judgment, this suit was filed initially by Summit, invoking the district court's diversity jurisdiction under 28 U.S.C. § 1332, against both Child Craft and its owners for breach of contract and the tort of conversion based on Child Craft's refusal to pay for the wood products shipped pursuant to the 2008–2009 purchase orders. Summit even sought to pierce the corporate veil to hold Child Craft's owners personally liable for the alleged wrongs.

Child Craft counterclaimed for breach of contract against Summit and also for the tort of negligent misrepresentation against both Summit and Bienias. In its breach of contract counterclaim, Child Craft sought to recover its labor costs for re-working the defective products and for lost sales. In its negligent misrepresentation counterclaim, Child Craft alleged that it detrimentally relied on Bienias's representations

that the delivered goods would and did conform to specifications. Child Craft sought to recover over $5 million in compensatory damages—a figure representing the total loss of its business—plus punitive damages of over $5 million.

For procedural reasons we address below in Part III, the only claim that went to trial was Child Craft's counterclaim for negligent misrepresentation against Bienias personally. The claim was tried to the court. The judge's findings of fact and conclusions of law favored Child Craft, awarding initially over $4 million in compensatory damages, which the judge later reduced to just over $2.7 million, against both Bienias and Summit. Bienias and Summit have appealed the judgment against them. Child Craft has cross-appealed the reduction of compensatory damages and the judge's decision not to award punitive damages.

## II. *Child Craft's Negligent Misrepresentation Counterclaim Against Bienias*

Child Craft's negligent misrepresentation counterclaim against Bienias fails as a matter of law because it is barred by Indiana's economic loss doctrine.

### A. *Standard of Review*

We review the district court's factual findings for clear error and the court's legal conclusions *de novo*. See *Tax Track Systems Corp. v. New Investor World, Inc.*, 478 F.3d 783, 789 (7th Cir. 2007); *Mayer v. Gary Partners & Co.*, 29 F.3d 330, 334 (7th Cir. 1994) ("When federal judges act as triers of fact in diversity cases, all questions concerning the standard of appellate review are governed by federal law."). The decisive issue here is a legal one.

### B.  *Indiana's Economic Loss Doctrine*

Indiana substantive law governs this case. Under Indiana's economic loss doctrine, and subject to certain exceptions we discuss below, "there is no liability in tort for pure economic loss caused unintentionally." *Indianapolis-Marion County Public Library v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 736 (Ind. 2010) ("*Indianapolis Library*"). The rule reflects the general principle that contract law is better suited than tort law to address the problem of commercial losses caused by mere negligence. See *Miller v. U.S. Steel Corp*, 902 F.2d 573, 574 (7th Cir. 1990); accord, *Indianapolis Library*, 929 N.E.2d at 729 (favorably citing *Miller* and discussing its rationale).

Merchants negotiating a contract can allocate between themselves the risk of commercial losses flowing from possible breaches. The economic loss doctrine recognizes this reality and prevents a commercial party from recovering in tort for commercial losses it could have protected itself against through contractual terms such as warranties, indemnification, or provisions for remedies. For the classic discussion of the justification for the economic loss rule, see *Seely v. White Motor Co.*, 403 P.2d 145, 150–51 (Cal. 1965) (Traynor, C.J.); see also *Wausau Underwriters Ins. Co. v. United Plastics Group, Inc.*, 512 F.3d 953, 957–58 (7th Cir. 2008) (collecting cases and discussing rationale); *Progressive Ins. Co. v. General Motors Corp.*, 749 N.E.2d 484, 488 (Ind. 2001) (discussing rationale); *KB Home Indiana Inc. v. Rockville TBD Corp.*, 928 N.E.2d 297, 304 (Ind. App. 2010) (same).

Indiana courts apply the economic loss rule to preclude recovery in tort for "*purely* economic loss—pecuniary loss unaccompanied by any property damage or personal injury

(other than damage to the product or service provided by the defendant)." *Indianapolis Library*, 929 N.E.2d at 730. Here, the damages sustained by Child Craft were purely economic. All of its damages flowed from the fact that Summit delivered non-conforming goods under the purchase orders.

The rationale for the economic loss rule applies squarely to the facts of this case: in this contract for the sale of goods by one merchant to another, Child Craft could negotiate the scope of remedies for non-conforming goods. (In fact, it negotiated for a term in the contract entitling it to $30 per man-hour in labor costs for re-working defective products.) Unless Child Craft can satisfy an exception to the economic loss doctrine, the doctrine bars any recovery on the negligent misrepresentation counterclaim against Bienias.

C. *Child Craft's Arguments for an Exception*

Indiana courts recognize several exceptions to the economic loss doctrine, but none fits this case. Child Craft's first argument for an exception is based on the nature of the claim it is pursuing. Under Indiana law, negligent misrepresentation can qualify as an exception to the economic loss rule, but only in limited circumstances.

The key case is *U.S. Bank, N.A. v. Integrity Land Title Corp.*, 929 N.E.2d 742 (Ind. 2010), where the Indiana Supreme Court held that the economic loss rule did not bar tort liability for commercial losses sustained in connection with a defective title search. There, a title insurance company failed to discover a foreclosure judgment on real property. It issued a title commitment to a lender representing that the title search had not uncovered any judgments against the seller of the real property. Eventually the plaintiff bank acquired

the lender's interest in the real property and was forced to defend against the holder of the foreclosure judgment. The Indiana Supreme Court held that the economic loss rule did not bar the bank's negligent misrepresentation claim against the title insurance company even though the bank's losses were purely economic. *Id.* at 749–50.

Two considerations were critical to the court's decision. First, the court emphasized that the plaintiff bank and the defendant title insurance company were *not* in contractual privity with one another. See *id.* at 745 ("Integrity has argued at every stage of this litigation that it was not in contractual privity with U.S. Bank. This is a critical point. Were there to be a contract between Integrity and U.S. Bank, the parties in all likelihood would be relegated to their contractual remedies."), citing *Indianapolis Library*, 929 N.E.2d at 729; see also *id.* at 749 n.6 ("we do not adopt the proposition that a tort claim for negligent misrepresentation may be brought where the parties are in contractual privity"). Second, the court emphasized the special factors that apply in the context of title insurance: "Title searches are frequently required in situations involving transactions in which the state of the title must be known accurately or the customer will foreseeably suffer harm that is both certain and direct." *Id.* at 749. Neither of these considerations applies here.

Child Craft counters that the "privity" factor actually cuts in its favor. Although there was contractual privity between it and Summit, Child Craft contends Bienias should be considered an independent third party, personally liable for the statements he made about contract performance during the life of the contract.

Indiana law does not support this sweeping assertion. If it were accepted, it would open new vistas for commercial litigation freed of the contract law framework that has been built over the past couple of centuries. Bienias was a corporate officer and employee of Summit. He made each allegedly negligent misrepresentation about whether the goods would or did conform to the contract's specifications in his capacity as an agent for the corporation. Under Indiana law, an agent acting within the scope of his authority is not personally liable in carrying out a contractual obligation of the principal. See *Greg Allen Construction Co. v. Estelle*, 798 N.E.2d 171, 173 (Ind. 2003) ("The proper formulation of the reason Allen is not liable here is that his negligence consisted solely of his actions within the scope of his authority in negligently carrying out a contractual obligation of the corporation as his employer."). In those circumstances, the plaintiff is "remitted to [its] contract claim against the principal," and it "should not be permitted to expand that breach of contract into a tort claim against either the principal or its agents by claiming negligence as the basis of the breach." *Id.*

We recognize the possibility that an agent could exceed his authority by engaging in an intentional wrong (such as fraud) and thus become personally liable under tort principles. Cf. *Indiana Civil Rights Comm'n v. County Line Park, Inc.*, 738 N.E.2d 1044, 1050 (Ind. 2000) (discussing situations where corporate officer can be held personally liable for torts of the corporation, including fraud and unlawful intentional discrimination); Restatement (Second) of Torts § 552, cmt j. (1977) (discussing differences between fraudulent and negligent misrepresentations). Child Craft has never pursued a theory of intentional wrongdoing against Bienias. Child Craft has alleged and proved to the satisfaction of the district

judge that Bienias was negligent, but only negligent, in failing to discover that the raw wood components shipped by P.T. Cita failed to comply with the specifications demanded by Child Craft.

Child Craft argues that the rule of *Greg Allen Construction* does not apply here because Bienias made "affirmative misstatements" about whether the goods would conform to the contract's specifications. For example, Bienias told Child Craft that a shipment of cribs was "ready" even though Bienias personally doubted whether the cribs would conform to the specifications.

There are two problems with this argument. First, even if Bienias made affirmative misstatements about whether the goods would or did comply with the contract's specifications, he still made them within the scope of his authority as an agent for Summit. Holding Bienias personally liable for statements made within the scope of his authority as an agent to Summit would effectively "make the agent the promisor when the parties had arranged their affairs to put the principal, and only the principal, on the line." See *Greg Allen Construction*, 798 N.E.2d at 173. Under Child Craft's theory, however, a buyer bringing a breach of contract claim against a seller would always be able to bootstrap a negligent misrepresentation claim against any corporate employee who promised that the goods would conform to the contract's specifications. That view of personal liability would work a dramatic change in Indiana law of business organizations and would effectively nullify the economic loss doctrine in cases of non-conforming goods.

Second, we have found no Indiana case supporting Child Craft's assertion that the economic loss rule should not apply

because Bienias made "affirmative misstatements" as opposed to simply remaining silent about whether the goods conformed to the contract's specifications. Even with a silent delivery of goods, sellers are ordinarily treated as implicitly representing that the goods meet certain specifications. See Ind. Code § 26-1-2-314 (Indiana adoption of Uniform Commercial Code provision on implied warranty of merchantability in sales of goods). In any event, Indiana cases make clear that the economic loss doctrine applies in cases of explicit misstatements. See *Prairie Production, Inc. v. Agchem Division-Pennwalt Corp.*, 514 N.E.2d 1299, 1304–06 (Ind. App. 1987) (economic loss doctrine barred negligent misrepresentation claim where defendant negligently labeled pesticides); *Martin Rispens & Son v. Hall Farms, Inc.*, 621 N.E.2d 1078, 1090–91 (Ind. 1993) (favorably citing *Prairie Production* and holding that economic loss doctrine barred claim for negligent marketing of seeds infected with a disease), *abrogated on other grounds by Hyundai Motor America, Inc. v. Goodin*, 822 N.E.2d 947 (Ind. 2005). If Child Craft's theory were viable, though, we would expect to see many Indiana cases holding that the buyer can recover in tort for that type of "affirmative misstatement." Child Craft has not cited any such case, and we have found none.

In a final attempt to take its negligent misrepresentation counterclaim against Bienias outside the economic loss rule, Child Craft says that Bienias can be held personally liable for negligent misrepresentation because he was a "professional broker," and that Indiana imposes tort liability on professional brokers notwithstanding the economic loss doctrine.

We are not persuaded. It is true that Indiana recognizes an exception to the economic loss rule for certain special re-

lationships. *Integrity Land* held that a title insurance company could be liable for commercial losses on a negligent misrepresentation theory, and it noted that the economic loss rule would not necessarily bar tort liability for commercial losses against lawyers, fiduciaries, and liability insurers. See 929 N.E.2d at 745 ("However, we cautioned that the economic loss rule admits of certain exceptions for purely commercial loss in several special circumstances."); see also *Indianapolis Library*, 929 N.E.2d at 736 ("But Indiana courts should recognize that the [economic loss] rule is a *general* rule and be open to appropriate exceptions, such as (for purposes of illustration only) lawyer malpractice, breach of a duty of care owed to a plaintiff by a fiduciary, breach of a duty to settle owed by a liability insurer to the insured, and negligent misstatement."). Child Craft cites no authority, however, for the proposition that the corporate representative of a merchant in an ordinary dispute between a seller and a buyer of goods should be considered in the same vein.

Instead, Child Craft seizes on Bienias's trial testimony that he considered himself a "broker." The district court placed great emphasis on this testimony as well, describing Bienias as a "professional advisor" to Child Craft. We defer as we must to the district court's factual finding, but even so, the fact that Bienias considered himself a broker does not establish that he owed a special duty to Child Craft. This is the key portion of Bienias's testimony:

> Q: Can you describe for Judge Pratt—obviously, we have three entities here. We have Child Craft and then Summit and then Cita. What were the nature of the contractual relationships among those three?

> A: Well, I acted as the broker, and they would—and I would sell it to them, and I would purchase it from Cita.
>
> Q: So you were essentially standing in the middle?
>
> A: That is correct.

This is far too thin a read to support imposing a special duty on Bienias. He was simply a commercial supplier, positioned in the middle between an upstream producer of raw materials and a downstream manufacturer. Child Craft's own manager confirmed as much when he testified:

> Mr. Bienias—I heard the name "broker" before. *Mr. Bienias wasn't a broker*, because a broker typically gets two to four to five percent, a surcharge on top of anything you're procuring. Mr. Bienias was getting a much greater cut of that, *and Mr. Bienias was actually the supplier of record*. There was never—there wasn't even an entry in any of our business systems that referenced P.T. Cita. *So, Mr. Bienias was the supplier.* Whether he chose to go to the one supplier, P.T. Cita, or the other supplier that he had in Indonesia, or some place in Chile, he would have to tell us that that was going on, but that's his call, *because we're buying from him*.

(Emphases added.)

True, Bienias had specialized education and a long history of experience in the wood processing industry. He holds a bachelor's degree in forestry, a master's degree in wood technology, and a degree in business, and he has held a vari-

ety of jobs in the industry, including quality control manager, manufacturing manager, and plant manager for several furniture manufacturing companies. But that expertise does not justify imposing a special duty of care on him as an agent of the seller. Commercial suppliers often know more about their products than their buyers. That discrepancy does not transform a garden-variety commercial relationship into something akin to a lawyer-client, fiduciary, insurer-insured, or employer-employee relationship. Cf. *Integrity Land*, 929 N.E.2d at 745–76; *Indianapolis Library*, 929 N.E.2d at 736; *Jim Barna Log Systems Midwest, Inc. v. General Cas. Ins. Co. of Wisc.*, 791 N.E.2d 816, 830 (Ind. App. 2003) (recognizing negligent misrepresentation claim in the context of employer-employee relationship). Bienias was not compensated by Child Craft for supplying information. He was compensated only as an employee and owner of the corporation that would receive payment under the contracts for the sales of goods.

The only case the district court cited to support its conclusion that Bienias owed a special duty to Summit was *Jeffrey v. Methodist Hospitals*, 956 N.E.2d 151 (Ind. App. 2011), an unfortunate case involving an adoption. The plaintiffs were a married couple who planned to adopt a child. They asked a social worker employed by the defendant hospital about a prospective child's health. The mother told the social worker that she would rely on her judgment in deciding whether to adopt the child. The social worker told her that the child was healthy and without any abnormalities.

After the parents completed the adoption, they discovered that the child had a large hole in the left side of his brain, a condition associated with severe neurological defi-

cits. The parents sued the hospital for negligent misrepresentation, arguing that the social worker as an agent of the hospital owed a special duty to communicate "accurate and complete information" about the child's medical status. *Id.* at 153–54, 156. The court held that the plaintiffs had stated a viable claim for negligent misrepresentation against the hospital (not the social worker in her individual capacity), reasoning that the hospital had "superior knowledge and expertise with regard to the information its employees gave the Jeffreys, and it was in the business of supplying information of that nature." *Id.* at 157 (internal quotation marks omitted).

*Jeffrey* does not support Child Craft's position here. First, there was no contract between the plaintiffs and the defendant hospital or the social worker. Unlike Child Craft, the Jeffreys were not in a position to protect themselves by insisting on warranties or other terms allocating risk among the parties to a contract.

Second, the special relationship between two prospective adoptive parents and a social worker employed by a hospital is simply not comparable to an arm's-length commercial transaction between two merchants for the sale of goods. The parents could not have been reasonably expected to discover abnormalities with the child. That is why they asked the hospital's employee to advise them. Here, by contrast, Child Craft could have and in fact did send its employees to inspect P.T. Cita's manufacturing facilities. If Child Craft did not have the expertise to inspect the products itself, it could have paid someone else, perhaps even Bienias, to perform the inspection. But it did not hire an expert and did not pay Bienias to supply information.

At bottom, in commercial settings the tort of negligent misrepresentation is designed to protect plaintiffs who reasonably rely on advice provided by defendants who are in the business of supplying that information. That is why Indiana recognizes the tort in situations involving lawyers, fiduciaries, and insurance companies. Bienias was not in the business of supplying information to Child Craft. He provided the information about whether the goods would conform to the contract's specifications in connection with a contract for the sale of commercial goods. Cf. Restatement (Second) of Torts § 552, cmt. a (1977) ("[O]ne who relies upon information in connection with a commercial transaction may reasonably expect to hold the maker to a duty of care only in circumstances in which the maker was manifestly aware of the use to which the information was to be put and intended to supply it for that purpose.").

Here, one merchant agreed to sell goods to another. Child Craft's losses flowed only from the receipt of nonconforming goods. Indiana's economic loss rule bars its negligent misrepresentation counterclaim against Bienias, who acted and spoke within his authority as an agent to the principal.

III. *The Entry of Default Against Summit and Summit's Claims Against Child Craft*

We now turn to the second set of issues in these appeals, which stem from procedural problems that arose when the lawyer for Summit and Bienias moved to withdraw just a few weeks before the trial. That motion triggered a series of case-management decisions by the district court. These decisions culminated in the district court (1) entering default against Summit on Child Craft's breach of contract and neg-

ligent misrepresentation counterclaims, and (2) dismissing Summit's claims against Child Craft. The district court first dismissed Summit's claims without prejudice, but the court eventually refused to reinstate the claims, thereby making the dismissal with prejudice.

We set out the procedural history below and ultimately conclude that the district court abused its discretion in refusing to set aside the default on the negligent misrepresentation counterclaim against Summit. In all other respects, the district court did not abuse its discretion in managing the problems posed by counsel's withdrawal.

A. *Procedural History*

After discovery and at least one continuance of the trial, the court set the trial date for June 10, 2013 and warned the parties that no further continuances would be granted without just cause. On April 22, 2013 Summit filed another motion to continue the trial date. The court denied the motion on April 25. On April 27, the lawyer representing Summit and Bienias moved to withdraw from the case. The district court denied the motion to withdraw because it did not conform to the local rules. The following day, counsel renewed the motion.

On May 7, the district court held a telephone conference with counsel, but Summit's and Bienias's lawyer did not participate. During the call, the district court explained it would take the motion to withdraw under advisement pending verification that counsel had advised Summit that it could not represent itself because it was a corporate entity. See *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1427 (7th Cir. 1985). The following week, on May 13, the district court held

another telephone conference and asked the lawyer representing Summit and Bienias about his pending motion to withdraw. He told the court that both Summit and Bienias had consented to his withdrawal, that his clients did not have the money to go forward, and that he thought Summit intended to dismiss its claims against Child Craft (or at the very least to allow them to be dismissed without objection). The district court granted the motion on May 14 and gave Summit five days to hire a new lawyer or to show cause why its claims should not be dismissed and default judgment entered against it on Child Craft's counterclaims.

Summit did not hire new counsel by the May 19 deadline. The final pretrial conference convened the following day, with Bienias and Summit unrepresented by counsel. The district court asked whether Summit was going to hire new counsel and Bienias, appearing *pro se*, did not give a clear answer. He seemed to suggest that his decision depended on whether Child Craft would agree to drop its counterclaims against him and Summit. The district court patiently explained (again) that a corporation could not proceed without representation. The court eventually continued the pretrial conference until May 28, giving Summit one last opportunity to obtain new counsel. The district judge suggested that Bienias talk things over with his recently-withdrawn lawyer in the meantime.

At the May 28 telephone conference, Summit and Bienias again appeared without counsel. The court dismissed Summit's claims against Child Craft without prejudice and entered default against Summit on Child Craft's breach of contract and negligent misrepresentation counterclaims. During the conference, Bienias orally moved to continue the trial

date on Child Craft's remaining negligent misrepresentation counterclaim against him in his personal capacity, and the court denied the motion.

On June 5, a little more than a week after default had been entered, new counsel appeared on behalf of both Summit and Bienias. The next day the new attorney filed motions to continue the trial, to set aside the "default judgment" against Summit, and to reinstate Summit's claims against Child Craft. The court denied all three motions. In a written order, the court explained that Summit had failed to satisfy the standard under Federal Rule of Civil Procedure 60(b) but did not address Rule 55(c). Summit appeals both decisions.

B. *Standard of Review*

We first need to sort out a little procedural confusion on these issues. In its written entry on the May 28, 2013 hearing, the district court said it had entered "default judgment" against Summit on the counterclaims against it and that its claims against Child Craft were dismissed without prejudice. But the district court did not actually enter a judgment of any kind against Summit.

A default judgment would have fully resolved the counterclaims against Summit, including the amount it owed, and to be final it would have needed to have been certified as a separate and appealable final judgment under Federal Rule of Civil Procedure 54(b). Here, no amount of damages was specified and no separate Rule 54(b) judgment was entered. See generally *Sims v. EGA Products, Inc.*, 475 F.3d 865, 868 (7th Cir. 2007) (explaining difference between default judgment and entry of default); *Home Ins. Co. of Ill. v. Adco*

*Oil Co.*, 154 F.3d 739, 741 (7th Cir. 1998) (noting difference and its importance in a case against multiple defendants). When Summit's new counsel moved to set aside the default on June 6, the court still had not entered a default judgment against Summit.

Relief from a truly final default judgment must be sought under Rule 60(b). See 10A Charles Alan Wright et al., *Federal Practice & Procedure* § 2695 (3d ed. 1998). Without a final judgment, though, Summit's motion to set aside the default should have been evaluated under Rule 55(c), not under Rule 60(b) as the district court did. Under either rule, the district court exercises discretion, but the Rule 55(c) standard is somewhat more lenient. As we explained in *Sims*, an entry of default may be set aside for "good cause," which does not necessarily require a good excuse for the defendant's lapse. 475 F.3d at 868; see also *Chrysler Credit Corp. v. Macino*, 710 F.2d 363, 368 (7th Cir. 1983) (standards are applied more leniently before judgment has actually been entered), citing *Breuer Electric Manufacturing Co. v. Toronado Systems of America, Inc.*, 687 F.2d 182, 187 (7th Cir. 1982); 10A Wright et al., *Federal Practice & Procedure* § 2696 ("a default entry may be set aside for reasons that would not be enough to open a default judgment"). Summit also challenges the district court's refusal to reinstate its claims against Child Craft, and that decision is also reviewed for abuse of discretion. E.g., *McCormick v. City of Chicago*, 230 F.3d 319, 326–27 (7th Cir. 2000).

C. *The District Court's Decisions*

We apply a deferential standard of review because the district court is "the forum best equipped for determining the appropriate use of default to ensure that litigants who

are vigorously pursuing their cases are not hindered by those who are not in an environment of limited judicial resources." *Swaim v. Moltan Co.*, 73 F.3d 711, 712 (7th Cir. 1996) (citation and internal quotation marks omitted). The district court was not required to wait "indefinitely" for Summit to obtain new counsel. See *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1427 (7th Cir. 1985). Nor is a corporation entitled to grant itself a continuance by firing or failing to pay its lawyers.

But even so, the district court abused its discretion in refusing to set aside the entry of default against Summit on the negligent misrepresentation counterclaim. As best we can tell, Summit was without a lawyer for no more than about two weeks before the court acted. The entry of what turned out to be a multimillion dollar damages award against it, without regard for the merit of the claim, gives us serious pause. See *Degen v. United States*, 517 U.S. 820 (1996) (finding abuse of discretion in defaulting litigant in $5.5 million civil suit given availability of lesser sanctions, even where litigant was fugitive outside the country). And when we consider the possible prejudice to Child Craft on the other side of the scale, we see very little. Allowing Summit to present its defense alongside Bienias's defense would have caused no prejudice to Child Craft or to the court. That defense would have involved the same lawyer and the same evidence. As the district court observed in its entry on damages, the "evidence presented at the damages hearing as to Mr. Bienias also goes toward Summit," and the court actually based its final judgment against Summit on that same evidence.

The best reason supporting the district court's entry of default was that there was so little time before trial. But less-

er sanctions would have been much better suited to address the two-week gap in representation. For example, the court could have adjusted and/or enforced deadlines for final trial preparations to protect Child Craft from unfair delays or other prejudice without the ultimate sanction of default.

Another option would have been to require Summit's prior counsel to continue representing Summit at trial. After all, that lawyer had filed the case in the first place. He and his client were obliged to protect the court and Child Craft from prejudice resulting from problems in his relationship with his client. See Ind. R. of Prof. Conduct 1.16(c) ("When ordered to do so by a tribunal, a lawyer shall continue representation notwithstanding good cause for terminating the representation."); see also, e.g., *Burns v. General Motors Corp.*, No. 1:06-cv-00499-DFH-WTL, 2007 WL 4438622 (S.D. Ind. Nov. 30, 2007) (denying motion to withdraw); *Hammond v. T.J. Litle & Co.*, 809 F. Supp. 156, 159 (D. Mass 1992) (denying leave to withdraw: "An attorney who agrees to represent a client in a court proceeding assumes a responsibility to the court as well as to the client.").

Another important factor in our review of the entry of default against Summit is the strength of its defense on the merits of the negligent misrepresentation counterclaim. Summit's defense on that claim is as strong as Bienias's defense: the economic loss doctrine simply bars the claim as a matter of law. A multimillion dollar judgment on a specious legal theory is too heavy a sanction for a corporation's two-week gap in representation, especially when setting aside the entry of default would not have caused prejudice to the opposing party or the court's docket. See *Sims*, 475 F.3d at 868 ("Damages disproportionate to the wrong afford good

*cause* for judicial action [under Rule 55(c)], even though there is no good *excuse* for the defendant's inattention to the case."). That is especially true where, as here, Summit's new lawyer moved to set aside the entry of default a little more than a week after the entry of default. We find that the entry of default against Summit on the negligent misrepresentation counterclaim and refusal about a week later to set it aside added up to an abuse of discretion. We will direct the entry of judgment in favor of Summit on that counterclaim for the reasons discussed in Part II of this opinion.

The result is different for the district court's dismissal of Summit's own claims for relief against Child Craft and the relatively minor breach of contract counterclaim against Summit. Where Summit was the complaining party, the district court was entitled to expect Summit to be prepared to pursue its case and not to keep Child Craft in suspense in the weeks before trial about whether Summit would be pursuing its claims. On Child Craft's breach of contract counterclaim against Summit, where the judgment was for $11,000 and Summit has not offered any plausible defense, the district court's decision was not an abuse of discretion.

We REVERSE the district court's judgment on Child Craft's negligent misrepresentation counterclaim against Ron Bienias and Summit and direct the district court to enter final judgment in favor of Bienias and Summit on that counterclaim. In all other respects, we AFFIRM the district court's judgment. All parties shall bear their own costs on appeal.